[Crim. No. 1132. Third Appellate District.—August 12, 1930.]

THE PEOPLE, Respondent, v. JAMES HOOVER, Appellant.

Gaddis & McDonald for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THOMPSON (R. L.), J.—The defendant was convicted of murder of the second degree. He was a professional pugilist. He pleaded guilty to a charge of former conviction of burglary. About noon on the thirty-first day of January, 1930, in company with his brother Lester, he entered the office of Erickson, who was a dealer in used automobiles. This office was a small wooden shack situated in the yard at Broderick, where the automobile business was conducted. The Hoover brothers attempted to negotiate an exchange of their machine, which they had previously wrecked by colliding with a telephone pole, for a Dodge car. Erickson, Roy, the deceased, and his brother Henry Smith, Ray Eustes, Portlock and Corey, together with the Hoover brothers were about the office most of the afternoon. They were all drinking wine from a jug. No one was noticeably intoxicated, however, except Corey, who was employed by Erickson to paint old machines. A dispute arose between the defendant or his brother and Corey over the proposed exchange of machines. The defendant then sat in the office on a stool hacking at the floor with a hand-axe. Erickson was temporarily absent. Corey, who was assuming to act for the owner of the business, offered to trade a certain Dodge car for the defendant's machine for $75 in addition. The defendant sneered at Corey and said he was not much of a dealer, adding, "I could have traded with Bud (Erickson) for $50. . . . You better go out and wipe the grease off of the cars, where you belong." Corey retorted that he did not have to wipe off grease, that he could make more money in two hours after dark than the defendant could make in a week. In anger the defendant sprang from the stool and, rushing over to Corey, threatened him with the axe. The bystanders told him to throw down the axe, which he did. The defendant then struck Corey and knocked him down. The deceased, who was sitting upon a divan, then said: "There is no call for anything like that; that is no way to treat that man, the condition he is in," or "That isn't any way to treat an old man." The defendant then again picked up

the axe and started for the deceased, saying: "You want some of it too." The deceased then said: "Drop that axe and I will go with you." Thereupon the defendant threw the axe down and before the deceased arose from the divan struck him several times. The deceased then jumped up and a fierce fistic battle ensued. The stove was overturned. The furniture was upset or wrecked. The glass in the window and door was broken. The little shack fairly rocked with the violence of the affray. In spite of the superior size and weight of the deceased, the defendant appeared to have the advantage. He was landing three or four times as many blows as the deceased. Henry, the brother of the deceased, objected to what he termed unfair fighting on the part of the defendant. Lester Hoover, the brother of the defendant, then assaulted Henry. The fight became general. Both Corey and Portlock had gone outside. Suddenly the defendant, who had been knocked over against the wall, pulled a knife from his pocket and, opening it, stabbed the deceased repeatedly. Henry Smith saw the stabbing and attempted to aid his brother, but was prevented from doing so by the interference of Lester Hoover. Portlock, looking in through the window, saw the defendant draw his knife and shouted: "Not a knife, Hoover; you are whipping him, anyhow." After having been stabbed several times the deceased fell wounded and bleeding to the floor. He never again arose. The fatal thrust of the knife penetrated his lung. He died from this knife wound soon afterward. There is evidence that after the deceased had fallen to the floor fatally wounded, and lay there helpless, that the defendant viciously kicked him in the face several times. The absence of severe contusions on the face of the deceased, disclosed by the post-mortem examination, may discredit the claim that he was kicked in the face. The defendant then fiercely drove the other occupants of the room out of the office by threatening them with the knife. He slammed the door and kept them out until an officer arrived within a few moments thereafter. The Hoover brothers were then placed under arrest. The defendant denied that he had done any cutting with a knife, but later asserted that the deceased first drew this knife and attempted to use it on the defendant and that he knocked the deceased down, secured the knife and used it only in

self-defense. The bloody knife was found behind the divan in the room, where it is reasonable to assume the defendant threw it when the officer arrived. There is little doubt the knife belonged to the defendant and that he deliberately drew it from his pocket in the midst of the affray and with malice assaulted the deceased with it. Three witnesses testify to having seen him draw the knife and attack the deceased with it. Early in the afternoon he offered to trade this very knife to Erickson in part exchange for a watch. It was definitely identified as the knife of the defendant. No other knife was used in the affray.

The appellant contends that the evidence will not support the verdict; that there is an absence of evidence of malice on the part of the defendant; that, at most, he is guilty of no higher offense than manslaughter and that the court erred in giving and refusing certain instructions.

There is no merit in the appeal. There is ample evidence of the guilt of the defendant. He appears to have been the aggressor in the brawl. His attitude toward Corey and the deceased was that of a bully. He was a professional pugilist and seemed to want to exhibit his fighting ability. Under the circumstances of this case he could not complain of a fistic beating at the hands of his adversary. He provoked the quarrel and instigated the conflict. He was not satisfied with apparently prevailing in the fistic encounter. He became furious and angry and without cause destroyed his adversary with a knife. He then denied the ownership of the knife and evidently attempted to hide it after the affray was finished. Under the circumstances of this case he was neither warranted nor legally authorized to use a deadly weapon upon his adversary. Every indication disclosed by the record is that he used the knife in malice, intending to kill his opponent. Manslaughter is the killing of a human being without malice. (Sec. 192, Pen. Code.) Malice "imports a wish to vex, annoy or injure another person." (Sec. 7, subd. 4, Pen. Code.) If the fatal blow was struck by the defendant in the present case in malice, then he was guilty of murder and not manslaughter. Who can doubt from the facts of this case that in the use of the knife the defendant deliberately intended to kill the deceased? If he did then the definition of malice, to wit, the "wish to . . . injure another person" is ful-

filled. ■ The appellant contends, however, that at most, the killing was accomplished "upon a sudden quarrel, or (in) the heat of passion," and that it was, therefore, mere voluntary manslaughter under the provisions of section 192 of the Penal Code. It may not be reasonably contended, however, that one who has instigated a quarrel, who is himself the aggressor and who in good faith has failed to desist and withdraw from the fistic encounter, may resort to the use of a deadly weapon and then escape from the penalty of murder on the theory that it was the result of a sudden quarrel or that the fatal act was the result of mere heat of passion. ■ Both the quarrel and the consequent heat of passion were the result of his own voluntary conduct. Under such circumstances the question of the existence of malice was a problem for the determination of the jury. There is ample evidence in this case to support the verdict of murder of the second degree.

■ The appellant complains of the giving of plaintiff's instructions numbers 15 and 18. The language of these instructions was taken *verbatim* from the statement of the court in the case of *People* v. *Hecker,* 109 Cal. 451, 462 [30 L. R. A. 403, 42 Pac. 307]. In our judgment, under the facts of this case, neither of these instructions was misleading or prejudicial.

■ The appellant also complains of the refusal to give his instructions numbers 44, 45, 47 and 48. These instructions involve the definition and application of manslaughter and malice. They were fully covered by other instructions which were given. Accurate and accepted definitions of both degrees of murder and of manslaughter as well as the code definition of malice were given. The jury was fully, fairly and elaborately instructed as to every essential element of the offense charged. We are of the opinion there was no prejudicial error in giving or refusing the instructions complained of.

The judgment and the order are affirmed.

Finch, P. J., concurred.