[Crim. No. 1162. Third Appellate District.—September 25, 1931.]

THE PEOPLE, Respondent, v. AURELIO MONTEZUMA, Appellant.

Carl Barnard and Russell P. Tyler for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THOMPSON (R. L.), J.—The defendant was convicted of murder of the first degree and sentenced to life imprisonment. It is contended the court erred in failing to instruct the jury on its own motion upon the subject of manslaughter. It is also asserted the defendant was prejudiced by precluding him from proving that the prosecuting witness had been previously convicted of a misdemeanor.

The defendant and two companions had been engaged for eight years in cutting wood on the Gilder ranch in Sonoma

County. Montezuma's associates were Joe Cruz, the prosecuting witness, and Julian Celaya, the deceased. They all ate their meals together in the Cruz cabin. The defendant slept in an adjoining shack. These cabins were located a short distance from the Gilder dwelling-house. Some dissension arose between the defendant and Cruz regarding the cooking. The defendant had the impression that Cruz had criticised him for his failure to pay for his proportion of the provisions. Except for this incident these wood-choppers appear to have associated on friendly terms.

January 30, 1931, this trio ate dinner together in the Cruz cabin. They afterward engaged in several friendly games of checkers, during which they drank some wine. Cruz then retired to his own bed in the same room. The defendant and the deceased continued to play checkers. About 8 o'clock Alfred Gilder, the proprietor, appeared and watched the game for a few moments. He says they seemed to be on friendly terms. There was then no evidence of dissension between them. Gilder went home. At 10 o'clock he heard some disturbance at the cabin, but made no investigation regarding the cause thereof.

The three wood-choppers were the only witnesses to the affray. The defendant maintained he was not present when Celaya was stabbed and that he knew nothing of the affair. He claims that he left the cabin for a moment to go to a toilet; that when he returned he found a glass of wine on the table where he sat; that he sipped the wine and told Celaya that it tasted as though someone had put tobacco in it; that Celaya told him the wine was all right, and he drank it. He said that in a few moments he became dizzy and fell upon the floor unconscious; that he arose some time afterward and went to his own cabin without saying a word; that he did not return until the following morning and that Celaya was then gone. His sole defense consists of a denial that he stabbed the deceased. He claims that he knew nothing about the homicide. He infers that the prosecuting witness, Cruz, killed Celaya.

The evidence furnishes satisfactory proof of the defendant's guilt. A controversy existed between the defendant and Cruz regarding the cooking. About three weeks before the homicide the defendant cut off a portion of the end of a case knife and ground it down to a point like a dagger,

sharpening the blade upon both sides. This knife was placed beside a clock on a shelf in the cabin. At daylight on the morning following the homicide, the defendant appeared in the Cruz cabin, and after preparing his own breakfast, he took his game bag and went hunting. After the arrest of the defendant human blood was found upon his shoes and upon the clothing which he wore the night of the homicide. Human blood was also found upon his hunting bag.

Cruz at first denied having any knowledge of the homicide. After he and the defendant were taken into custody by the officers, he made a statement of facts conforming substantially to the testimony which he gave at the trial. There is no conflict regarding the participation of the three wood-choppers in their dinner and the friendly games of checkers in the Cruz cabin the night of the homicide. Cruz testified that after they had been playing checkers for about an hour, he went to bed in the same room which they were then occupying; that the defendant and Celaya continued to play checkers for some time, during which period Gilder appeared at the door of the cabin, and after watching the game for a few moments he went away; that the defendant arose from the table later and began to complain about former criticism on the part of Cruz regarding the defendant's failure to pay his share of the cost of provisions; that the defendant became angry, and, addressing himself to Cruz as he lay in bed, he said "You been talking about the cooking business . . . all the time. I said to him, 'No, Monte, I never say nothing to you about cooking, we eat together, but I never say anything to you.' . . . That is what I tell him, and he keep it up, mad, you know. He says, 'God damn you, I am going to kill you.' . . . Grab right here twice, grab and lift me up about four inches in the bed. . . . I said, 'No, Monte, leave me alone, I don't do any harm to you.' " In anger, the defendant then rushed over to the shelf and seizing the improvised dagger which he had previously prepared, in one hand, and a butcher knife in the other, he returned to the bedside, flourishing the knives over the face of the prosecuting witness and threatening to kill him. Cruz drew his arms over his face to protect it, but was cut upon his left wrist during the defendant's frenzied demonstration. The deceased, Julie Celaya, then came toward the defendant, protesting against his threatening

conduct. He said: "No, no, Monte, let him sleep; leave him alone." The defendant then turned upon Celaya and knocking him against the foot of the bedstead, rushed upon him and stabbed him to the heart with the pointed knife. Celaya fell to the floor and expired instantly without uttering a word. The knife blade penetrated the left ventricle of the heart and death resulted instantly. A large lump was found on the back of the head of the deceased, evidently caused by striking either the foot of the bedstead or the floor as he fell. No other provocation for the fatal attack upon the deceased by the defendant appears in evidence.

Cruz further testified that after killing Celaya the defendant stood for a moment looking at his form as it lay upon the floor; that he then threw the knife back of a box in the room, and after deliberating for a moment left the cabin, but soon returned and taking a blanket from the bed, he wrapped the body of the deceased in it and carried it out "just like a baby". He deposited the body with a hat over the face in a field beyond the vineyard, at a distance of about four hundred feet from the cabin. He did not return to the Cruz cabin, but went directly to his own house and retired. At daylight the following morning, he returned to the Cruz cabin and searched for the knife which he had thrown behind the box. He inquired from Cruz regarding the knife, but failing to find it, he took his gun and game bag and went hunting.

About 11 o'clock Gilder appeared and inquired for the deceased. He obtained no information from Cruz at that time. He then proceeded to haul a load of grapes from the vineyard and in so doing observed the body of the deceased lying in the field. Thinking Celaya was asleep, he approached the body and discovered that he was dead. He then returned to the cabin and told Cruz that he had found the dead body of Celaya down in the field, and immediately left to summon the officers.

In the meantime the defendant returned. Cruz told him that Gilder had found the dead body of Julie Celaya down in the field. The defendant replied: "I don't believe you." Cruz asked him to go with him to the field where the body lay, but the defendant said: "No, I don't want to see. I want to go right to the house and make a cross," to mark the grave.

When the officers arrived they found the body in the field with a piece of burlap over it and his hat resting over the face. Celaya was dead. The body was quite rigid. A pool of blood left a spot under the body in the vicinity of the wound. A postmortem examination showed that the incision of the knife reached the heart, and that death ensued from that cause.

An examination of the cabin disclosed some evidence of an affray. A broken chair was found. There were blood spots on the floor where the body of the deceased first fell. Several sacks, some of the bedding and the defendant's clothing, shoes and hunting bag contained spots which proved to have been caused by human blood. The officers found the defendant engaged in making a wooden cross.

The preparation of the sharp-pointed knife by the defendant, his denial that he knew anything about the homicide, and the presence of human blood on the clothing, shoes and hunting bag, together with Cruz's story of the affray, furnishes satisfactory proof that Montezuma killed the deceased.

■ There is sufficient evidence to sustain the verdict of murder of the first degree. The defendant was superior to his companions in size and strength and he appeared to domineer over them. One may not instigate a quarrel, become the aggressor in an affray, and without first seeking in good faith to withdraw from the conflict, kill his adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. (*People* v. *Hoover*, 107 Cal. App. 635 [290 Pac. 493].)

■ There is no merit in the contention that the court erred in failing to adequately instruct the jury regarding the elements of the crime of manslaughter which lesser offense may have been properly included within the crime of murder with which the defendant was charged. No such instruction appears from the record to have been offered by the defendant. Nor was it error to fail to include among the forms of verdicts which were given to the jury by the court, a form for the offense of manslaughter. It is claimed the court should have more fully instructed the jury on its own motion regarding the elements of the offense of manslaughter, for the reason that the evidence shows the homicide

may have been committed by the defendant without malice while he was engaged in a sudden quarrel or in mere heat of passion.

It appears the jury was very fully and fairly instructed regarding the necessary elements of murder, including a proper definition for malice both express and implied. The court charged the jury that to constitute the crime of murder with which the defendant was accused, "The intent to kill must be the result of a deliberate premeditation; it must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation." The jury was further told that a homicide is excusable "when committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no unfair advantage was taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner". Upon the subject of manslaughter, the court instructed the jury: "Where there has been premeditation and deliberation, as I have defined those terms to you, there can be no heat of passion within the meaning of the statute to reduce the crime to manslaughter. To reduce the killing from murder to manslaughter, you must find from the evidence that such killing was the result of a sudden, violent impulse of passion on the part of defendant, produced by sufficient provocation to excite the passion of a reasonable person, situated as the defendant was situated, and the interval of time, if any, was not sufficient for defendant's passion to cool and subside, and (for) the voice of reason (to be) restored." The foregoing instructions were correct declarations of law so far as they went. No further instructions upon the subject of manslaughter, or otherwise, appear to have been submitted to the court by the defendant. No other forms of verdict were offered by the defendant. The theory of the defendant was that he did not stab or kill the deceased. He denied that he participated in or had any knowledge of the homicide. There was no contention on the part of the defendant that he killed the deceased upon a sudden quarrel or in the heat of passion or at all.

From the fact that the jury was fully instructed regarding the necessary elements of the crime of murder together with a correct statement of such circumstances as would reduce

the crime to manslaughter or constitute justifiable or excusable homicide, and that the jury was furnished without objection with four forms of verdicts, including that of murder of the second degree, and deliberately found the defendant guilty of the highest degree, it seems apparent the jury was not disposed to consider any crime in connection with the case except that of murder. Twice the jury returned into court, during its deliberations and asked the court for information regarding the penalties provided by law for the crimes of murder in the first and second degrees. The subject of manslaughter was not mentioned by the jurors. During the trial the defendant made no claim of a sudden quarrel or striking the deceased in heat of passion or any other circumstances which might reduce the killing to manslaughter. His sole defense rested upon· his denial that he killed the deceased, or that he knew anything about the homicide. The act of the defendant of stabbing the deceased appears to have been deliberate. He was angry and threatening to kill the prosecuting witness. The deceased was protesting against his conduct toward Cruz. He resented the interference and turning in wrath upon the deceased, he stabbed him to the heart and killed him. His wrath was exhibited by first knocking the deceased over against the bed. This evidence will support the implied finding of the jury that the defendant killed Celaya with malice aforethought. ■ Express malice is manifested by a deliberate intention to take away the life of a fellow creature. It is implied, when no considerable provocation for the killing appears. (Sec. 188, Pen. Code.) No provocation appears for the killing of the deceased in the present case. Malice would therefore be implied from the nature and circumstances of the act.

■ Failure of the court to voluntarily charge a jury respecting the law of a lesser degree of a crime, even though it may be properly included in the offense with which the accused is charged, will not constitute reversible error, in the absence of a request for such omitted instructions. (*People* v. *Worden,* 113 Cal. 569 [45 Pac. 844, 846] ; 8 Cal. Jur. 310, sec. 363; 16 C. J. 1023, sec. 2451; *People* v. *Modina,* 146 Cal. 142 [79 Pac. 842] ; *People* v. *Bailey,* 142 Cal. 434 [76 Pac. 49] ; *People* v. *Barney,* 114 Cal. 554 [47 Pac. 441] ; *People* v. *Franklin,* 70 Cal. 641 [11 Pac. 797] ; *People* v.

*Ross,* 89 Cal. App. 132, 139 [264 Pac. 314].) The Worden case first above cited determines the contention of the defendant in this case regarding the failure of the court to voluntarily instruct the jury upon the subject of manslaughter, adversely to him. In that case the appellant was convicted of murder of the first degree, carrying with it the death penalty. The court there failed to instruct the jury upon the subject of murder of the second degree or of manslaughter, except that the statutory definition of murder of the second degree was given. The jury was not instructed that it was permissible under the circumstances of that case to find the defendant guilty of any offense less than murder of the first degree. Only three forms of verdicts were furnished the jury. The forms of neither murder of the second degree nor manslaughter were among those which were given to the jury. In that case, like the case at bar, the sole defense which was relied upon by the defendant was that he was not present and did not participate in the crime consisting of derailing a train which caused the death of the deceased for which he was charged with murder. Regarding the failure of the court in that case to furnish the jury with a form of verdict covering the crime of murder of the second degree, the court said:

''No objection was made by the defendant or his counsel in response to such charge by the court relative to such forms of verdict, defendant's counsel remaining silent; also no instruction was upon the trial of this cause requested by the defendant or his counsel as to what verdicts the jury could render, or as to what constituted either the crime of murder in the first degree, murder in the second degree, or manslaughter, nor was the court requested by the defendant or his counsel to instruct the jury that it was within their province to find the defendant guilty of any lesser crime than the crime charged in the information. Moreover, it is plain from the evidence introduced by appellant, and the instructions asked by him, that he presented his case entirely upon the theory that he did not do the appalling and 'most horrible' acts ascribed to him, and did not participate in such acts. . . . In the general charge the judge gave the statutory definition of murder in the second degree, and did not refuse any instruction asked upon the subject by appellant. Under these circumstances it was not the duty of the

judge to affirmatively suggest to the jury that they might convict appellant of a lesser offense when not asked by appellant to do so, and when such suggestion apparently would have been against appellant's wishes; and no error was committed by not doing so.''

No case is cited in this jurisdiction which is in conflict with the foregoing rule of law. In each of the cases which is relied upon by the appellant, wherein it is said instructions should have been given upon the law of lesser offenses which under the evidence may have reasonably been included within the crime charged, the proposed instructions upon the omitted subject were offered by the accused and refused by the court. No such proposed instructions were offered in the present case. A defendant may not complain of a failure to charge the jury upon a particular phase of the case regarding which subject no proposed instruction is submitted by him to the court, provided the instructions which are given to the jury correctly state the law.

■ The defendant charges the court with error in sustaining an objection to the question propounded to the prosecuting witness, Cruz, as to whether he had not been previously convicted of a misdemeanor consisting of an alleged assault with a knife upon one Vandolini. It is conceded this evidence was not competent for impeachment purposes under section 2051 of the Code of Civil Procedure. But it is asserted that it is competent to discredit the witness and to show he had a motive which would indicate that he was more likely to have committed the homicide than the defendant. This evidence was first admitted over the objection of the district attorney, but it was subsequently stricken from the record and the jury was charged to disregard it. This ruling was not erroneous.

While the record does show that this witness was once charged by an information filed in the superior court with an assault with a deadly weapon upon one Vandolini, it is apparent he was permitted to plead guilty to a simple assault and was committed to the county jail for a misdemeanor. While he was charged with a felony, he was convicted of a misdemeanor only. A witness may not be impeached by evidence of his former conviction of a mere misdemeanor. (*People* v. *Carolan,* 71 Cal. 195 [12 Pac. 52] ; *People* v. *Lando,* 92 Cal. App. 405 [268 Pac. 439].) A

witness may not be impeached "by evidence of particular wrongful acts". (Sec. 2051, Code Civ. Proc.) The testimony of the witness Cruz could not be legally discredited by evidence of his conviction of an assault amounting to a mere misdemeanor which had no relation to the crime with which the defendant was charged. Nor does the prosecuting witness' guilt of another misdemeanor furnish evidence of a motive for accusing the defendant with the commission of this homicide. There is no relative connection between that offense and the homicide with which the defendant is accused. The objection to the proof of this prior offense was properly sustained, and the evidence of that conviction was appropriately stricken from the record.

The judgment and the order are affirmed.

Plummer, J., and Preston, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 19, 1931, and the following opinion then rendered thereon:

THE COURT.—Upon petition for rehearing the court's attention is called to an inaccurate statement to the effect that a controversy between the defendant and Cruz "was conceded". It appears that defendant did deny this dispute. It was, however, satisfactorily established. Alfred Gilder, the owner of the ranch upon which the homicide occurred, referred to the matter. This controversy was important only as tending to show enmity on the part of the defendant toward Cruz, which the jury was entitled to assume may have been transferred to the deceased when he interfered with defendant's attack upon Cruz. One further circumstance appears in the evidence which might furnish a motive for defendant's ill will toward the deceased. It appears the mother of the deceased had brought suit in the justice's court of Sebastopol against the defendant. He admitted this fact, but insisted that this suit caused no enmity against the deceased. The evidence or malice is sufficient upon which to support the verdict.

The appellant also complains of the disposition of his charge of prejudicial error on the part of the trial court in refusing to give certain instructions to the jury. Several

instructions on the subject of manslaughter appear in the record which are indorsed by the judge, "Refused, covered by other instructions." There is nothing in the transcript indicating which party offered these instructions. Our opinion therefore correctly states that, "No such instruction appears from the record to have been offered by the defendant." The appellant complains of this statement and now claims to have offered these rejected instructions. In the language of our opinion, this court was careful not to say the defendant did not offer the instructions. All that we said is that it does not appear from the record that the defendant offered them. ■ The rule is firmly established that error in the refusal to give instructions is not available to a defendant on appeal unless the record affirmatively shows they were offered by him. (8 Cal. Jur. 539, sec. 544; *People v. Baker*, 64 Cal. App. 336, 343 [221 Pac. 654]; *People v. Hettick*, 126 Cal. 425, 429 [58 Pac. 918]; *People v. Vukojevich*, 25 Cal. App. 459, 464 [143 Pac. 1058]; *People v. Olds*, 86 Cal. App. 130 [260 Pac. 321].)

With the modification of the opinion above suggested, the petition for a rehearing is denied.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 23, 1931.

Langdon, J., dissented.