[Crim. No. 6690. In Bank. Mar. 16, 1961.]

THE PEOPLE, Respondent, v. THEODORE GULLICK et al., Appellants.

Joseph M. Rosen, under appointment by the Supreme Court, for Appellants.

Stanley Mosk, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

TRAYNOR, J.—Defendants Theodore Gullick and James Robert Crumbey appeal from judgments of conviction entered on a jury verdict finding them guilty of burglary and assault with a deadly weapon and from orders denying their motions for new trial.

Boy's Market in Los Angeles was burglarized and James W. Robinson, a porter in the market, was assaulted on the evening of February 15, 1959. There were two principal witnesses for the prosecution, Robinson, the porter, and William Grant, Jr., a confessed conspirator, who implicated defendants after a promise of immunity from the district attorney. Defendants contend that they had no connection with the crimes.

Robinson testified that he was alone in the market cleaning up after closing hours when he was surprised by two men who stabbed and beat him and then tied him up. He managed to shuffle into the elevator, where he was found three hours later by police officers and the vice-president of the market. An officer testified that Robinson described his assailants as "Two male Negroes, one five foot six and one five foot seven, one weighed 150 and the other 152; they both had black hair; eyes, color unknown: One wearing brown coat and the other dark shirt."

Grant had previously been a porter at the market. When he was called as a witness, the trial court advised him of his right to refuse to answer questions tending to incriminate him, and the district attorney then offered him immunity. (Pen. Code, § 1324.) Grant testified that it was his idea to burglarize the market and that he decided to "employ Mr. Crumbey or someone because I didn't know too many fellows around at the time." He met Crumbey to discuss the details of the burglary. Crumbey said he knew another fellow by the name of "Buzzy." Grant testified that the night before the burglary he and defendants drove out to "case the store." He explained the security system of the market and told defendants how to break in. On the afternoon of February 15, about three hours before the burglary, Grant told defendants to "forget the whole deal." They said, "O.K." He testified that his next conversation with defendants was on February 18, when they told him that he should have gone along with them.

Gullick testified that he did not know Crumbey until he met him in jail after his arrest for the burglary and assault. Gullick denied knowing Grant, other than having shined his shoes. He stated that his nickname was "Ted," not "Buzzy." It was stipulated that if called, Officer Jobe would testify that he arrested Gullick, who first denied that his name was "Buzzy," but then stated, "Oh, yes, my friends call me Buzzy, but you upset me. That is why I didn't tell you who I was." It was also stipulated that on the day Grant testified that he spoke to Gullick, Gullick was in jail on an unrelated charge. Crumbey admitted knowing Grant, who "had ideas I was fooling around with his wife."

Defendants contend that the trial court erred in failing to instruct the jury on the law of accomplices and the necessity of corroboration of accomplice testimony. All their instructions relating to the definition of an accomplice, accomplice testimony, and the necessity of corroboration of such testimony were refused.

 There is evidence that Grant was an accomplice. He admitted that he instigated the conspiracy and aided and abetted the burglary by disclosing his knowledge of the market and its security system. The jury was not required to believe his further testimony that he withdrew from the conspiracy before the crimes were committed. (See Code Civ. Proc., § 1847; *People* v. *Cowan*, 38 Cal.App.2d 231, 242 [101 P.2d 125].) The trial court therefore erred in failing to instruct

the jury that if it found Grant to be an accomplice, his testimony should be viewed with distrust (Code Civ. Proc., § 2061, subd. 4) and would require corroboration to support a conviction. (Pen. Code, § 1111.)

The attorney general contends, however, that Robinson's identification of defendants fully supports their conviction and that therefore the failure to instruct on the law of accomplice testimony was not prejudicial. It is true that Robinson identified both defendants at the trial. His testimony, however, casts considerable doubt on the probative value of his identifications. He testified that he had not seen his assailants before the night of the burglary. A month later, when asked to look at "mug shots" of suspects, he was unable to identify his assailants. He testified, "Several pictures looked like them, you know, you can't. . . ." Six months after the burglary he was taken to police headquarters for a lineup and identified defendants as his assailants. He testified, however, that at that time an officer told him that they had the men who committed the crime and wanted him to identify them. His testimony was confused and contradictory. He testified that there were two lineups about four minutes apart and that there were only three colored men in the lineup, defendants and Grant. He knew Grant, having worked with him at the market. He later testified that there was a fourth Negro in the lineup, but that he was a "young kid," much younger than the others in the lineup. On redirect examination he testified that he only looked at two men at the police station. He also testified that he was scared to death at the time of the burglary and had blacked out and could not remember what his assailants wore or whether he had given their description to the police officers. He had described them at the time, however, as being "five foot six and five foot seven." Crumbey is 6 feet tall, and Gullick's height does not appear.

From a review of the entire record we have concluded that it is reasonably probable that the jury concluded that Robinson had no independent recollection of the identity of his assailants and identified defendants at the trial solely because the officers had told him that they had the men who committed the crime and then presented defendants to him. If so, Grant's testimony was crucial, and instructions on accomplice testimony essential. Under these circumstances it is "reasonably probable that a result more favorable" to defendants "would have been reached in the absence of the error," and accord-

ingly the error is prejudical. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgments and the orders denying the motions for new trial are reversed.

Gibson, C. J., Peters, J., White, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—In reversing the judgments of conviction entered on the jury's verdicts of guilty, the majority hold that the evidence would support a finding that William Grant was an accomplice of defendants, and hence that the trial court erred in refusing to instruct on the law of accomplices and on the necessity that accomplice testimony be viewed with distrust and be corroborated. The majority refer only to portions of the evidence;[1] but, according to their opinion, "From a review of the entire record," they determine "that it is reasonably probable that the jury concluded that [James W. Robinson, the principal prosecution witness, eyewitness and victim of the assault] had no independent recollection of the identity of his assailants and identified defendants at the trial solely because the officers had told him that they had the men who committed the crime and then presented defendants to him. If so, Grant's testimony was crucial, and instructions on accomplice testimony essential."

I agree that the failure to give the subject instructions was error; I cannot agree, however, that there is any substantial basis for concluding that such error was prejudicial. The majority give only lip service to the standard for reversal (under Cal. Const., art. VI, § 4½) articulated in *People* v. *Watson* (1956), 46 Cal.2d 818, 836 [12] [299 P.2d 243]: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." It is my opinion that if the majority would actually be guided by this rule and apply it to a fair statement of the facts in this case the judgments appealed from would be affirmed.

The history of this case in the trial court is briefly as follows: Defendants were tried before a jury on charges of assault with a deadly weapon with intent to commit murder,

---

[1]Significant aspects of the record, not mentioned in the majority opinion, are hereinafter related.

burglary, and kidnaping for the purpose of robbery. Robinson, the above mentioned victim of the assault, testified to defendants' appearance at night in the market where Robinson was employed, to defendant Gullick's attack with a knife, defendants' binding Robinson with rope, and moving him about the store, and Robinson's concealing himself in the elevator. William Grant, called as a corroborating witness, testified to his asserted initiation of the criminal plan and his likewise asserted withdrawal from it. The rear door of the market had been forcibly broken open; papers and empty money bags were strewn about the cashier's cage; and an audit disclosed that $849 in rolled coins had been stolen from the market.

The jury discriminatingly found that each defendant was not guilty of assault with intent to commit murder but was guilty of assault with a deadly weapon, that each defendant was guilty of burglary of the first degree, and that each defendant was not guilty of the alleged kidnaping.

It has frequently been held that "there is no prejudicial error [in failing to instruct on accomplice testimony] where the record contains ample evidence to support the judgment without consideration of the testimony of the accomplice" (*People* v. *Davis* (1954), 43 Cal.2d 661, 674 [20] [276 P.2d 801], and cases there cited; *People* v. *Wade* (1959), 169 Cal. App.2d 554, 557 [2] [337 P.2d 502]; and cf. *People* v. *Carswell* (1959), 51 Cal.2d 602, 606 [5] [335 P.2d 99]). The record before us admits of no rational basis for doubting that the crimes of which defendants stand convicted (assault with a deadly weapon upon the person of Robinson and burglary, in the first degree, of the Boy's Market) were committed. Neither is there any reasonable basis, as I read the record, for an *appellate* court to conclude that Robinson, although he told the truth when he testified that he had been assaulted and the market burglarized, probably perjured himself or was mistaken when he testified positively not only that he recognized the defendants as the perpetrators of the crimes but related in detail the acts of each. Direct identification by one eyewitness is, of course, ample evidence to connect a defendant with the crimes with which he is charged. (*People* v. *Whitson* (1944), 25 Cal.2d 593, 600-602 [1, 2], 604 [5, 7] [154 P.2d 867].)

The record shows that at the trial Mr. Robinson directly and positively identified defendants as his assailants. After stating that he observed two men in the market shortly after 9 p. m. on the night in question, Robinson testified as follows:

"Q. Did they say anything to you? A. Yes, they say, 'We came in here to rob the store and we got orders to kill you.'

"Q. Are 'they' the two defendants here? A. Yes, sir.

"Q. Who spoke to you first? A. The first fellow there.

"Q. This fellow with the light shirt? A. Yes.

"Mr. MADDEN [deputy district attorney]: May we have his name?

"Mr. PISER [defendants' counsel]: Gullick. . . .

"Q. The other defendant you say was by the place where the empty bottles were kept; that is, the defendant Crumbey here with the red shirt on? A. Yes. . . .

"Q. After they spoke to you, then what happened? A. He went at me with a knife and I grabbed him.

"Q. Who did that? A. The fellow with the light shirt.

"Q. Mr. Gullick did that? A. Yes. . . .

"Q. Did Mr. Crumbey have a knife also or not? A. The one in red; no, I didn't see one on him. . . .

"Q. When you got back to the point marked B [i.e., the back of the store], what happened there, if anything? A. They tied me up and I had my keys to the front door, and so they asked me what those keys were for, and I said, 'Those keys are for the front door.'

"Q. Where did you have those keys? A. I had those keys in my pocket.

"Q. Did one of these two defendants reach in your pocket and get the keys? A. No, they heard me and said, 'Give them to us.'

"Q. Who did you hand the keys to? A. The dark fellow.

"Mr. MADDEN: Indicating Mr. Gullick. THE WITNESS: Yes. . . .

"Q. By Mr. MADDEN: The two men you saw in the store, are you certain they are the two defendants here? A. Yes, they are the two defendants there."

The majority acknowledge (*ante*, p. 543) that "Robinson identified both defendants at the trial," but dismiss this fact with the statement that "His testimony, however, casts considerable doubt on the probative value of his identifications." In my opinion, none of the asserted weaknesses or contradictions which the majority then set forth justifies their conclusion (*ante*, p. 543) that "it is reasonably probable that the jury concluded that Robinson had no independent recollection of the identity of his assailants. . . ."

The majority first assert that when Robinson was asked to look at "mug shots" of suspects, "he was unable to identify

his assailants." But the majority fail to mention that when subsequently asked, "Did you see any of the defendants' [photographs] in there?" Robinson answered, "No"—and that there is *no testimony or other evidence whatsoever* that any photographs of defendants were in fact among those shown to the witness. It is therefore improper to imply, as do the majority, that photographs of defendants were shown to Robinson and that he failed to recognize them.

The majority next emphasize testimony that prior to letting Robinson view a lineup of suspects a police officer told him that they "had the men who committed the crime," and testimony that only three or four Negroes (including defendants and Grant) were then shown to the witness. While an identification made under such circumstances may perhaps be less reliable than one might prefer, it does not necessarily follow that Robinson failed to recognize defendants as his assailants when they were brought before him or that he had "no independent recollection" of the identity of his assailants.

The majority make much of their conclusion (*ante,* p. 543) that Robinson's testimony concerning the lineups "was confused and contradictory." It should be pointed out, however, that the questions asked of him by defendant's counsel were themselves confused and contradictory, and could scarcely have been answered in a coherent manner even by a witness with a far better educational background than Robinson's.[2] His failure to remember, a month after the lineup, the exact number of colored persons other than defendants among those shown to him is, in any event, irrelevant to the question of whether at the time of the lineup he had an "independent recollection" of the identity of his assailants. The statement of the majority that "On redirect examination he testified that he only looked at two men at the police station" is not a fair summary of the effect which the trier of fact could have given

---

[2] A sample of such questioning follows:

"Q. They actually had the showup or lineup twice—didn't these two gentlemen walk through *two times*? A. I think so. . . .

"Q. When you went down there, how many men were in the lineup the first time? A. I can't recall. I didn't count them. I just recall those two.

"Q. There were three colored gentlemen, weren't there, *the fourth time*? A. Three or four, I don't know, Mexican, Caucasian—I don't know how many there was in the lineup. . . .

"Q. The fact is, *they had two lineups* and the first time in that lineup there were just three men of the colored race, is that correct? A. No, they had these two fellows and another fellow and Grant. I don't know whether they had more colored or not." (Italics added.)

that portion of Robinson's testimony. Particularly in view of the witness's lack of facility in either comprehending the questions of others or articulating his replies, such testimony, quoted in the margin,[3] could be understood to mean that he looked *at* 10 or 12 men but was only looking *for* his two assailants for the purpose of identifying them.

Testimony of Robinson that during the period of the assault he was "dumbfounded and scared" and "I am telling you the truth, I blacked out, I don't know what they had on," could well have impressed the trier of fact as an indication of the witness's utter sincerity rather than an indication of his inability to identify his assailants.

The majority also stress (*ante*, p. 543) a discrepancy between the estimate of his assailants' height which Robinson gave to the police and the actual height of defendants.[4] The point is of little importance. The estimate in question was made by Robinson immediately after his release from the elevator and while he was still in a weak and frightened condition, in an honest attempt to reproduce descriptively his assailants' features from his mental image of them. It remains true, as this court has said, that "Ordinarily the power to accurately describe human features is with most persons a limited power" (*People* v. *Connelly* (1925), 195 Cal. 584, 593 [1] [234 P. 374]). It is therefore not surprising, in the circumstances in which Robinson made his estimate, that there should have been some such discrepancy.

The remaining weaknesses found by the majority in Robinson's testimony are equally without significance. This is not a case where the eyewitness caught only a fleeting glimpse of the faces of his assailants. Here it is undisputed that the witness "walked right [up] to their face" and was addressed by them; they grappled with him and knocked him down, then picked him up and took him to the back of the store where they tied him up; they questioned him about his keys,

---

[3] "Q. How many men altogether did they show you that evening? A. Well, on the other men who were there, I guess about 10 or 12.

"Q. Altogether you looked at 10 or 12 men? A. Not myself; that was other people, you know, picking the people out.

"Q. How many people were shown to you that you were to look at? A. Just these two that came in on me. . . .

"Q. . . . Perhaps from what you told us before and what you tell us now there seems to be some confusion. Altogether how many men did you look at for the purpose of identification on the night that you saw these two men, the defendants, at the station? A. Two."

[4] As the majority recognize, Gullick's height does not appear in the record. Crumbey, who is said to be six feet tall, testified that he was "taller than" the others in the lineup (including Gullick).

then threatened to put him into the refrigerator but were dissuaded by him from doing so; and they finally dragged him to the bakery and left him there. This series of events consumed at least 10 to 15 minutes, during which time Robinson had ample opportunity to see the faces of his assailants and to notice their bodily movements and their voices.[5]

When confronted thereafter by defendants, both at the lineup and at the trial, Robinson repeatedly and unequivocally identified them as the men who had attacked him on the night of the crime. His testimony to this effect, quoted hereinabove, is supported by the undisputed fact that he had ample opportunity to observe the features of his assailants. It is unshaken by defendants in any material respect, and in my view clearly sustains the jury's verdicts "without consideration of the testimony of the accomplice [Grant]" (*People* v. *Davis* (1954), *supra,* 43 Cal.2d 661, 674 [20]). The presence of Robinson's testimony distinguishes the present case from such decisions as *People* v. *Warren* (1940), 16 Cal.2d 103, 115 [8]—116 [9] [104 P.2d 1024], where it was conceded that "the *only* evidence in the record which may be considered as implicating [the defendant]" was the testimony of an accomplice (italics added; see also *People* v. *Bevins* (1960), 54 Cal.2d 71, 78 [8] [351 P.2d 776]). It follows that the error here in failing to instruct on accomplice testimony cannot fairly be deemed prejudicial.

The majority, in concluding that it is "reasonably probable" that the jury regarded as "crucial" the testimony of Grant (the witness who could have been found to be an accomplice), appear to attach more importance to that evidence than the prosecuting attorney claimed for it in his argument to the jury. Such argument correctly summarizes Grant's testimony as follows:

"There was another witness, Mr. Grant, who testified that he was acquainted with Mr. Crumbey. Mr. Grant also testified he worked at the Boy's Market and was acquainted with the security system they had where they telephone every hour, and in the event, I take it, that the ring is not made, then that is some indication that something is wrong there in the store.

"He testified that he talked with Mr. Crumbey about bur-

---

[5]Robinson testified on cross-examination that when defendants were asked to speak during the lineup he recognized them by their voices (as well as by their appearance), saying, "Well, after I heard it, anybody beating you like they did me—I don't know, I just knew the voice."

glarizing the Boy's Market, talked to him on several occasions about it . . . at Adams and Normandie in Mr. Grant's car. [Defendant Crumbey was subsequently arrested at this corner, and defendant Gullick's place of business was a block from it.] . . .

"Later on they discussed it again, and Mr. Grant testified that Gullick [*sic*] told him that he would get another person to help him. . . .

"[T]here was a discussion as to what the best time would be to go to commit the burglary of the Boy's Market, and Mr. Grant told him the best time was to go after the store was closed. They finally decided that the burglary was to be committed on Sunday, the following day [February 15, 1959, the day on which the crimes were committed], and they were to get someone else to help them with it.

"The following day, outside of the Normandie Club there at a bar on the corner, Mr. Grant talked with Mr. Crumbey about the burglary here again, . . . and the person known as Buzzy was introduced to Mr. Grant by Crumbey.

"Now, Mr. Grant identifies Buzzy as being Mr. Gullick here.

"Later on, several days after the burglary, Mr. Grant again had a conversation with Crumbey where they told him, 'Well, you should have gone along with them—' and of course, that means Mr. Gullick and Mr. Crumbey had already gone ahead and committed the burglary, and apparently there was some inference that they got some money; otherwise, why make a statement, 'You should have gone along.'

"But before that . . . Mr. Grant had told these two defendants . . . 'Let's forget the deal,' . . . and there is no indication that Mr. Grant himself was the person who participated in this burglary."

The prosecuting attorney continued his argument as to the witness Grant as follows: "Now you might say, well, this person, Mr. Grant, he is not a particularly reliable sort of person. So I think that perhaps we have to look to something else to perhaps give some credence to what he might testify to. So, if you are somewhat suspicious, you have a certain amount of corroboration or substantiation of what he testified to here by what the victim, Mr. Robinson, stated that these defendants stated to him —— 'Did you make your ring? When are you going to make your ring?' And he said, '10:00 o'clock.' . . . The two defendants told Mr. Robinson, 'You are not going to make that ring.'

"Whoever it was who committed these burglaries had some knowledge of that particular security system, this phone call arrangement.

"Now, we have positive identification of these two men by the victim, plus the fact that whoever did commit this burglary knew about the phone system; and that substantiates to some extent what Mr. Grant told these men as to how they could burglarize the store."

Finally, I would point out that one other circumstance in the record of this case may tend to explain its unusual treatment by the majority. The subject circumstance is not one which was before the trial court and is not one which, in my view, should affect the disposition of a cause before us. Wittingly or unwittingly, however, perhaps it does. Such circumstance developed as follows:

Defendants were jointly represented by an attorney throughout the proceedings in the trial court, but both served notices of appeal in propria persona. Gullick requested that the District Court of Appeal (Second District, Division Two) appoint counsel to represent him on appeal. The request was denied. He then petitioned the District Court of Appeal for an order augmenting the record on appeal by including therein the opening statement and opening and closing arguments of the prosecuting attorney and the instructions given and refused. These matters are not part of the "normal" record on appeal. (Rules on Appeal, rule 33(a).) "If the appellant desires such additional record he shall file with his notice of appeal an application describing the material which he desires to have included and the points on which he intends to rely which make it proper to include it." (Rules on Appeal, rule 33(b).) Gullick had not done this in the trial court. But since his failure to obtain the initial inclusion of the material in the record might be excused by his lack of counsel, he was entitled to petition the reviewing court for augmentation of the record. (Rules on Appeal, rule 12(a).)

Augmentation, however, is not a matter of right. It is subject to the discretion of the appellate court. (*Kalmus* v. *Kalmus* (1950), 97 Cal.App.2d 74, 76-77 [217 P.2d 64].) The party seeking it should allege facts justifying augmentation, just as the original transcript of matters additional to the "normal" record must be based, under rule 33, on a showing of good cause. The moving party should show generally what he expects the omitted matter to contain and how he expects to make use of such matter in the presentation

of his appeal. (See *People* v. *Parkinson* (1956), 139 Cal. App.2d 500 [293 P.2d 801].)

Gullick in moving the District Court of Appeal to augment the record alleged only that the requested matter was necessary "to properly prepare and present his . . . cause in and before the Appellate Court." That court without written opinion denied the motion. Gullick presented to this court a document entitled "Petition for the Writ of Mandamus," by which he asked that the District Court of Appeal, named as respondent, be directed to order augmentation of the record. This document was filed here as a petition for hearing. In it Gullick asserted, again in general terms, that the additional record which he sought in the District Court of Appeal contained "matter prejudicial to [his] substantial interest."

In fairness to Gullick, because he was then without counsel, his petition might well have been denied without prejudice to renewal of his motion in the District Court of Appeal and this court might (in accord with its often followed practice) have asked its clerk to direct Gullick's attention to the previously mentioned prerequisites to such a motion. This course was not followed, however. Rather, this court, without even the "normal" record on appeal before it and without any suggestion from Gullick as to what, if any, arguments he might advance on appeal, granted the "petition for hearing" and transferred to itself the cause on appeal as to both Gullick and Crumbey, as well as Gullick's motion, appointed counsel for the defendants, and granted the motion for augmentation.

Gullick prepared a brief in propria persona, and presented it to court-appointed counsel. As counsel well says in his supplemental brief, the brief prepared by Gullick "appears to set forth the issues with reasonable clarity and is well documented." Counsel, although diligent, has been able to add nothing to Gullick's own presentation of his case except a few citations and a more professional manner. Even more strikingly than in the situation to which I called attention in *People* v. *Brown* (1960), *ante*, pp. 64, 74 [9 Cal.Rptr. 836, 357 P.2d 1072], the actions of this court appear to have hindered and delayed rather than furthered or expedited the just disposition of this cause.

To reverse for a new trial in the circumstances here is, I believe, to disregard the positive admonition of article VI, section 4½, of the California Constitution and to work a miscarriage of justice directly upon the people of this state (as well as a waste of money) and eventually upon the defendants

who, on the same evidence should almost certainly be again convicted and, after the fruitless delay and expense caused by the majority's action herein, finally have to expiate the judgments in any event.

I would affirm the judgments.

McComb, J., concurred.

Respondent's petition for a rehearing was denied April 12, 1961. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.