[Crim. No. 3912.   First Dist., Div. Two.   Nov. 21, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. MALCOLM ROBERT JACKSON, Defendant and Appellant.

Merton R. Downing, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Joseph I. Kelly, Deputy Attorneys General, for Plaintiff and Respondent.

AGEE, J.—Defendant was convicted by a jury on counts one, two and three of a five-count indictment. He was acquitted on counts four and five. His notice of appeal is general in form but his counsel states in the opening brief that the appeal is from the judgment of conviction as to counts one and three only.

Count one charges a violation of section 182 of the Penal Code in that "during the days of April 30, 1960, and May 1,

1960,'' defendant conspired and agreed with one Franca and ''other persons'' to violate section 702 of the Welfare and Institutions Code, commonly known as the offense of ''contributing to the delinquency of a minor.''

Count two charges that on May 1, 1960, defendant accomplished an act of sexual intercourse with a named female who was under the age of 18 years and not his wife. This is the so-called ''statutory rape'' offense. (Pen. Code, § 261, subd. 1.) The girl will be referred to herein as ''M.''

Count three charges that on May 1, 1960, defendant ''aided and abetted'' Franca in the accomplishment by the latter of an act of sexual intercourse with ''M,'' she not being his wife either.

Counts four and five are the same as count three except that ''Frank Doe'' replaces Franca in count four and ''Mark Roe'' replaces Franca in count five.

The sole question presented on this appeal is whether the trial court committed *reversible* error in failing to instruct the jury that ''the testimony of an accomplice ought to be viewed with distrust.'' (Code Civ. Proc., § 2061, subd. 4.)

Respondent concedes that such failure to so instruct was error but contends that it does not require a reversal because ''the evidence of the appellant's guilt is overwhelmingly established by the testimony of other witnesses [than Franca] and the fact that the appellant failed to deny or explain the evidence presented against him.''

The answer to the question depends upon whether or not, in our opinion, after an examination of the entire record, it is improbable that a different verdict would have been reached if the error had not occurred. (*People* v. *Hamilton,* 33 Cal.2d 45, 51 [198 P.2d 873]; *People* v. *Gullick,* 55 Cal.2d 540, 543 [11 Cal.Rptr. 566, 360 P.2d 62]; *People* v. *Ahern,* 113 Cal. App.2d 746, 749 [249 P.2d 63].)

The People called as witnesses ''M,'' Franca, Dr. Hine and Police Officer Daly. The defendant did not testify but called his common-law wife (Mary) and one Kornbrodt as witnesses.

''M'' testified that she was a 17-year-old French-Canadian girl from Montreal; that she ran away from there to go to New York City, being accompanied by a ''boy friend'' with whom she had sexual relations; that she met a young man in New York named ''Danny'' and hitch-hiked to San Francisco with him, having sexual intercourse with him along the way; that they arrived in San Francisco on Thursday, April 28, 1960, and went to the ''Bagel Shop'' to meet a friend

of Danny's who tended bar there; that appellant came over to their table, introduced himself and offered to buy drinks; that about 9:30 p. m. she, the appellant, Danny and Danny's friend went from there to a bar called "Mr. Otis" where she had one beer; that while there she told appellant she was 17 years old and he offered to get her some "papers" showing she was 21 years old; that they stayed there until about midnight and then went back to the Bagel Shop; that that night and the next night she and Danny stayed at his friend's house; that on Saturday, April 30, about 4 p. m., she and Danny went to the Bagel Shop; that appellant came in about 6 or 7 p. m. and between then and midnight he bought her five or six glasses of beer; these were brought by appellant from the bar to where she was sitting at a table; about midnight appellant said he had to go to his apartment to pick up something and invited her and Danny to walk over there with him; when she arrived at the apartment she felt "very heavy" and "very sleepy"; there was a woman (Mary) asleep in the bed; she lay down on top of the bed and also went to sleep; Danny woke her up and asked her to go with him and appellant to meet a friend of the latter; she declined and remained at the apartment, sleeping; when Danny came back he woke her up to go home; she told him she was feeling very tired; appellant suggested that she stay there and sleep with "Mary" and that he would stay with some friends; Danny then left and, at appellant's suggestion, she disrobed and got into bed with Mary; later on, appellant woke her; she got up and dressed and he helped her walk down the stairs, across the street and up some other stairs; she had a hard time moving her arms and legs and felt "heavy"; the next recollection she had was of lying on a bed naked, with a Negro man lying on top of her; she later awoke and found appellant there talking to a colored man; she asked appellant where she was and he replied that it was a friend's room; she then put on her clothes and returned to appellant's room; she took off her clothes and got into bed, where Mary still was; when she woke up, appellant was in the bed with her, neither had on any clothes and Mary was gone; appellant then had sexual intercourse with her twice; Mary returned soon thereafter and they all had breakfast; while appellant was preparing the breakfast, "M" went out and bought some butter and some bread; then Mary and appellant left and she washed the dishes; while so engaged, a Filipino man, who later became known to her as Franca, entered the room and

talked to her for about 10 or 15 minutes; after he left, appellant and Mary came back; appellant took her out to a second-hand store and bought her shoes, skirts and a jacket for a total expenditure of about $6.00; after she and appellant got back, she went to the bathroom which was down a hallway, leaving appellant and Mary in the room; upon returning, appellant asked her to step outside of the room and then he told her she could get $10 for going upstairs to the Filipino's room; that she demurred and appellant told her that she was here illegally and that she had "better go"; appellant gave her directions to Franca's room and she went; she had an act of sexual intercourse with Franca and received $10 from him; she was in Franca's room about 45 minutes and, about 15 minutes before she left, someone knocked on the door; Franca talked to this person through an opening in the door; he later told her that the other person was appellant; upon her return to appellant's room, appellant asked her for the money and she gave it to him; appellant then told her he would buy her some more clothing and they went out together, leaving Mary in the room; this was about 11 a. m.; while walking along the street, appellant waved to a passing car and it stopped; appellant introduced the driver, who was Chinese, to her as "Frank"; appellant told her to get in the car and they started off; appellant and Frank then discussed her between them and Frank took some money out of his wallet and handed it to appellant; Frank then parked the car and went inside a building where he had a room; at appellant's insistence, she followed a few minutes later and had sexual intercourse with Frank in his room; then Frank drove her and appellant back to the latter's room; that about 1 p. m., appellant and she left and appellant took her to a place where he introduced her to a Chinese named "Mark"; there she posed in the nude for some camera studies which appellant had told her might be useful in obtaining work as a model; appellant stated that he was going for a walk for about 20 minutes; while he was gone, she and Mark engaged in an act of sexual intercourse for which Mark told her he had already paid $10 to appellant; this was then about the middle of the afternoon; appellant returned and she and he went to the Bagel Shop; while there, she asked appellant for some of the money she "had earned so well" and he gave her $15; then she and Danny, who had been waiting for her, left and she had no further contacts with appellant except that, one time at the Bagel Shop, he introduced a Chinese

named "Harry" to her and Danny; appellant took her aside and told her that if she would be "nice with him" she would gain by it; at a later time, again at the Bagel Shop, she saw Harry and told him that she and Danny had no money and hadn't eaten for two days; Harry bought her a dinner and gave her $2 to use for food for Danny; Harry told her that appellant had told him that she would come to his apartment; that she told Harry that she was in love with Danny and would not "go to bed" with anyone else; that she was taken into custody by the police on May 18, 1960, as a runaway; that Danny left for Alaska on June 26, 1960, and has been there since.

Franca's testimony (given through an interpreter) related to counts one and three. He testified that he lived in a room at the same hotel as appellant, on the floor above; on Sunday, May 1, 1960, about 10 a. m., he looked through the open doorway of appellant's room and saw "M" washing dishes; he remarked to appellant that he had a "very good-looking visitor," whereupon appellant asked him if he had any money; he told him that he had; appellant and Mary left and he talked to "M" for a few minutes about where she had come from and what she was doing there; Franca then went up to his room; in a few minutes "M" knocked on his door and told him that she wanted $10; he gave it to her and they had an act of sexual intercourse; after she had been there about 20 minutes, appellant knocked on the door but he told appellant to leave "because he [appellant] was hurrying me to be through."

Dr. Hine, a medical doctor and an expert on toxicology, in response to a hypothetical question based on "M's" testimony, testified that her condition on the night of April 30 and the early morning of May 1, as described in the question, was not caused by intoxication but could have been caused by "sleeping tablets or knockout pills or narcotics" or could have been caused by extreme fatigue or exhaustion.

Police Officer Daly interviewed "M" at the Youth Guidance Center on May 18 or 19, 1960; he then proceeded with a warrant of arrest to appellant's hotel; appellant denied the charges; he said that "M" had stayed in the room on the night in question but that he had not been in the room alone with her at any time. The officer then went to Franca's room and interviewed him. Franca gave him substantially the same account as he later gave in his testimony at the trial. This, of course, was hearsay and, being a statement of

a coconspirator made after the termination of the conspiracy, was therefore inadmissible. (*People* v. *Oldham,* 111 Cal. 648, 652-653 [44 P. 312]; *People* v. *Grace,* 88 Cal.App. 222, 233 [263 P. 306].) However, no objection was made to its admission.

Maurine (Mary) Jackson was called by the defendant and testified as follows: that she is the common-law wife of appellant; that about midnight of Saturday, April 30, 1960, she came home to the room which she shared with appellant and found ''M'' lying asleep on the bed; that she went out to look for appellant and found him on a nearby street corner; that they returned to the room and appellant tried to ''get her ['M'] sobered up'' by walking her around; that she left to find ''M's'' boy friend and returned with him to the room; that appellant and the boy friend left and she undressed and got into bed, with ''M'' lying on top of the bed fully dressed; that appellant came back about 6 or 7 a. m.; that she got up and dressed and appellant got in the bed, dressed only in shorts; that about 8 or 8:30 a. m. she left to go to the grocery store and was gone about 15 minutes; that when she got back appellant had dressed and ''M'' was sitting on the bed with her clothes on; that ''M'' went out to get some butter and when she returned they all had breakfast together; that about 9:30 a. m. she and appellant went out to see if a certain used clothing store was open, this being on Sunday; that when they came back ''M'' was washing the dishes and a Filipino man who lived upstairs (Franca) was there; then ''M'' left and was gone about 45 minutes; during this time appellant left the room for a few minutes; when ''M'' returned she did not hand $10 to appellant; this was before any clothes for her had been bought; then she and appellant went out for about an hour and returned with some clothes they had bought for ''M''; then about noon ''M'' left alone and appellant remained in the room for about an hour; he left about 2:30 p. m.; ''M'' came back about 3 p. m. with Danny to get some clothes she had left there; that she (Mary) had never been in the Filipino's room; that she loves appellant.

Kornbrodt testified that he was at the ''Mr. Otis'' on April 28 when appellant came in with ''M'' and introduced her to him; ''M'' had a certificate made out in French, which he read; he then told the bartender she was not 21 and she was not served; he remained there the rest of the time ''M'' was there; appellant's wife asked him to appear as a witness.

[■■] In attempting to reach a conclusion in this particular case as to whether, in the absence of the admitted error of the trial court, it is improbable that the jury would have arrived at a different verdict it is essential to consider the verdicts which were returned.

In convicting appellant on count two, the jury must have believed the testimony of ''M'' that she and appellant had had an act of sexual intercourse on the early morning of May 1. The only other testimony supporting the conviction was that of Mary that she had left ''M'' alone in the room with appellant while she went out for groceries, appellant then being clad in his shorts only, and the statement of appellant to Officer Daly that he had never been alone in the room with ''M,'' which, if believed to be false, would indicate a consciousness of guilt.

As to counts one and three, of which appellant was also convicted, the jury had the testimony given by Franca, as well as that given by ''M,'' as to all material elements of the respective offenses charged.

As to counts four and five, of which appellant was acquitted, the jury had only the testimony given by ''M.'' It found that this testimony, standing alone, did not convince them beyond a reasonable doubt of appellant's guilt as to such counts. It would seem logical to conclude, therefore, that it was Franca's testimony which, *added* to that of ''M's,'' convinced the jury beyond a reasonable doubt of appellant's guilt as to counts one and three. We do not say that this *had* to be so but we do say that it is reasonable to so conclude.

There are a number of appellate court decisions which, while acknowledging the same error as that involved herein, have held that, under the particular facts of the case being considered, such error did not require a reversal because, as respondent states in its brief, ''the evidence of the appellant's guilt is overwhelmingly established by the testimony of other witnesses.'' We do not believe that that situation is presented in this case. We do believe that the jury demonstrated, by its verdicts as to counts four and five, that it would not convict on the uncorroborated testimony of ''M'' and that, as to counts one and three, it was the testimony of Franca that added enough weight to convince them beyond a reasonable doubt of appellant's guilt thereof. This being so, the testimony of Franca and the manner in which it should be viewed by the jury becomes of great importance.

We hold that, under the particular facts of this case, the court's failure to instruct the jury that "the testimony of an accomplice [Franca] ought to be viewed with distrust" requires a reversal of the judgment of conviction. Some of the decisions reaching this conclusion are: *People* v. *Gullick, supra*; *People* v. *Hamilton, supra*; *People* v. *Ahern, supra.* Some of the decisions reaching an opposite conclusion are: *People* v. *Wade,* 169 Cal.App.2d 554 [337 P.2d 502]; *People* v. *Catlin,* 169 Cal.App.2d 247 [337 P.2d 113]; *People* v. *Johnson,* 153 Cal.App.2d 564 [314 P.2d 751]. Each case depends upon its own particular facts.

The judgment of conviction as to counts one and three is reversed and the judgment of conviction as to count two is affirmed.

Kaufman, P. J., and Shoemaker, J., concurred.

A petition for a rehearing was denied December 21, 1961, and respondent's petition for a hearing by the Supreme Court was denied January 17, 1962.