[Crim No. 7166. In Bank. June 4, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE
GLENN MODESTO, Defendant and Appellant.

Earl Klein for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Norman S. Sokolow, Deputy Attorney General, William O. Mackey, District Attorney, and Roland Wilson, Chief Trial Deputy District Attorney, for Plaintiff and Respondent.

TRAYNOR, J.—Defendant was convicted of two counts of first degree murder. The jury fixed the penalty at death on each count. Defendant admitted two prior felony convictions. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Shortly after midnight on October 29, 1961, defendant entered the home of Mr. and Mrs. Ardel Mack carrying a hand sledge hammer with a 4-pound head. The Macks' daughters, Connie, age 12, and Mary, age 9, were asleep in the house. At about 10:30 p.m. the previous evening defendant had seen Mr. and Mrs. Mack at a place where Mr. Mack played the guitar with a band and knew that they would not return home until about 2 a.m. Upon returning home, the Macks found Mary lying on the floor dead. Connie had disappeared. Her blankets were on the floor, and there was blood on her bed.

Defendant was arrested at his home at about 2:30 a.m., October 29, 1961. The arresting officers found bloodstains on the right rear fender, the right rear door handle, the rear seat, and the floor mat of defendant's automobile. The blood on the rear seat appeared to have been smeared by a body moving on the seat. Defendant's sledge hammer was removed from the trunk of his automobile. A chemist testified that the hammer had been heavily smeared with blood and had been washed.

At the time of his arrest, defendant was asleep in his bed, wearing only a pair of shorts. His hands were bloodstained, as were his shorts and his other clothes found on the floor of his room. A police chemist testified that there were semen stains on defendant's T-shirt, on the outside of his trousers, and on the shorts he was wearing when arrested.

At 7 p.m. on the day of his arrest, defendant admitted to police investigators that he struck Mary and Connie with the sledge hammer. He stated that he entered the Mack home ''with the intentions of scaring Connie Jean for the way she has been acting, snotty and smart-aleckie, and just to kind of get back at her for a lot of things she said. I went into the house through the side door. The house was dark and the door wasn't locked. So I went to the bedroom, flicked on the light and Connie Jean turned over and mumbled something and I shut the light off again, and I went over to shake her awake, and little Mary turned on the light, and I turned around with the intention of scaring her, and my hand went too far and I hit her with the sledge hammer. She went down, moaning, and Connie Jean started screaming, so I told her to be quiet, and I went like this (indicating) to hit her too, but my hammer just went right on and I hit her too; and I don't know, after that I don't know how many times I hit them—three or four or five times apiece—I don't know. They were moaning and screaming and I couldn't remember how many times I hit them.''

Defendant stated to the officers that he then picked up Connie and dropped her on the lawn, returning to the house for the hammer. After putting Connie's unconscious body on the rear floor of the car, defendant stated that he intended to go back for Mary, but panicked and drove away when he saw the lights of approaching automobiles. Shortly thereafter he stopped at a drainage ditch to clean the blood from Connie's head. ''When I opened the door her legs hung out. And the

next thing I knew she was on the ground—so I grabbed her by the hand and pulled her over to the side of that drainage ditch . . . so I could get some water to clean her off, and she just tumbled into the water, moaning loudly. . . .''

Defendant also stated to the officers that ''Between there [the drainage ditch] and . . . the house . . . I don't know where I stopped. I'm not sure in my mind, but I think—I think I had intercourse with Connie—I'm not sure.''

Connie's body was found face down in the drainage ditch downstream from the point at which defendant stated she had gone into the water.

Autopsies of the girls' bodies showed four separate injuries to Connie's head and five separate injuries to Mary's head, which were probably inflicted by the sledge hammer. Although drowning was the immediate cause of Connie's death, the injuries to her head would have been fatal. Mary's death resulted from injuries to the brain caused by multiple skull fractures. Since Connie had been carried downstream in rapidly moving water and had been in the water nine to ten hours, the pathologist was unable to state whether or not she had been sexually molested.

It was not disputed at the trial that defendant killed the two girls. The prosecution sought to prove that the killings were murders in the first degree on the ground that they were either wilful, deliberate, and premeditated, or occurred during the commission of burglary, rape, or an act punishable under Penal Code section 288. (Pen. Code, § 189.) There is no question of the sufficiency of the evidence to support the verdicts.

Defendant contends that the trial court erred in refusing to instruct the jury on the issue of manslaughter. Manslaughter is the unlawful killing of a human being without malice. Involuntary manslaughter is the killing without malice perpetrated ''in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . .'' (Pen. Code, § 192.) It was error to refuse the instruction if there is any evidence of manslaughter deserving of consideration. (*People v. Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281].)

In *People* v. *Carmen, supra,* we held that the defendant's statement that he had shot to frighten the victims but did not intend to kill or injure anyone and did not aim at them was evidence deserving of consideration and required the issue of

manslaughter to be submitted to the jury. Defendant's statement to the officers goes farther. He stated that his original intention was to frighten Connie. When the light came on unexpectedly, he turned toward Mary with the intention of scaring her. His hand went too far and he struck her. Then he struck Connie who had awakened, screaming. Thereafter, he struck each of the girls three or four times. He offered no explanation for these subsequent blows. He did not take the stand during the trial on the issue of guilt. His statement alone would not warrant submitting the issue of manslaughter to the jury, for the jury could not reasonably infer from it an absence of malice aforethought. (Pen. Code, §§ 188, 1105.)

There was other evidence of manslaughter, however, that was deserving of consideration. There was evidence that defendant ate no breakfast on Saturday, October 28, 1961; that he purchased six cans of beer about noon and 12 more about 4 o'clock; that he was drinking and intoxicated in the early afternoon; that by 4:30 or 5 o'clock he was "feeling pretty high," and that his eyes were bloodshot and his speech thick and slurred. Several witnesses testified that defendant appeared intoxicated when they observed him during the evening. At about 11:30 p.m. his stepfather drove him home because he was too drunk to drive. Defendant's wife testified that he appeared drunk when he arrived home; that he was "awfully drunk" and staggering when he left home again about midnight. When he returned, his clothes were bloody, and he was glassy-eyed and unable to walk without her assistance.

Dr. Zonnis, a psychiatrist, testified that she examined defendant both in a normal state and while he was in an hypnotic trance and gave him neurological and electroencephalogram tests. The results of the neurological test were "of questionable significance" and "did not add up to any particular picture." There was "some evidence of abnormality of the [electroencephalogram] test." Dr. Zonnis diagnosed defendant as a "passive-aggressive personality, aggressive type," explaining that this was a descriptive statement of his general personality configuration. "A person who falls into this classification, by description, tends to be irritable, short-tempered, at times given to temper tantrums. He tends sometimes to harbor resentments to a pathological degree." She diagnosed defendant as possibly suffering from organic brain disease of undetermined cause.

On the basis of her examination of defendant, Dr. Zonnis

was of the opinion that defendant did not enter the Mack house with the intent to take life; that he did not enter with the intent to strike either of the girls; and that he did not enter with the intent sexually to molest either of the girls.

On cross-examination, Dr. Zonnis was asked her opinion as to whether defendant had at any time formed an intent to hit the girls with the hammer. It was her opinion, based upon her examination of defendant and in view of the fact that he was at least moderately intoxicated at the time, that he did not intend to strike or to injure them. Dr. Zonnis testified in explanation of defendant's statement to the investigating officers that "being able to reconstruct what he has done does not necessarily mean to me that he knew what he was doing at the time." He became aware that he had struck the girls only after the fact. Dr. Zonnis testified that because of defendant's intoxication "there was a deficiency or disturbance of usual insight and judgment and very possibly a disturbance in motor control."

The prosecutor questioned Dr. Zonnis with regard to defendant's intent at the time he struck each blow to the head of each of the girls. Dr. Zonnis was of the opinion that in each instance defendant did not consciously intend to strike either girl. "I see all of the blows as part of the same situation, possibly a reflex, automatic and uncontrolled." She was asked, "What do you mean by [the statement] he did not consciously intend to strike her?" and responded, "I should say in terms of deciding that he wished to strike her, and being consciously aware of the fact that he was striking her."

In the light of the foregoing evidence, the court erred in refusing to give defendant's requested instruction on the issue of manslaughter. "It is a settled rule that jury instructions must be responsive to the issues. The issues in a criminal case are determined by the evidence. . . . *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citing cases.] *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.*" (*People* v. *Carmen*, 36 Cal.2d 768, 772-773 [228 P.2d 281].)

 Section 22 of the Penal Code provides that "whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular

species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.'' In *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492], we held that under a general plea to the charge of murder a defendant might show that because of voluntary intoxication he did not possess the mental state—malice aforethought—necessary to a conviction of murder in either degree. (51 Cal.2d at pp. 731-734.) That case, moreover, stands for the proposition that psychiatric testimony that negates the specific mental state essential to a particular crime is relevant and admissible as a ''partial defense.'' ''It would seem elementary that a plea of not guilty to a charge of murder puts in issue the existence of the particular mental states which are essential elements of the two degrees of murder. . . . Accordingly, it appears only fair and reasonable that defendant should be allowed to show that in fact, subjectively, he did not possess the mental state or states in issue.'' (51 Cal.2d at p. 733.)

Accepting the testimony of defendant's witnesses that he entered the Mack house in a state of intoxication intending only to frighten Connie, and that when he struck the blows that resulted in the girls' deaths he did so without conscious intent either to strike or to injure them, the jury could have found defendant guilty of involuntary manslaughter.

In *People* v. *Carmen, supra,* we held it reversible error to refuse a manslaughter instruction when there is any evidence that would warrant a conviction of manslaughter. (36 Cal.2d at pp. 773-774.) ▮ Reversal is not required because of a reasonable probability that in the absence of the error the jury would have reached a different verdict (see *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), but because the defendant has a constitutional right to have the jury determine every material issue presented by the evidence. ▮ Regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by article VI, section 4½, of the California Constitution, for the denial of such a right itself is a miscarriage of justice within the meaning of that provision. (*People* v. *McKay,* 37 Cal.2d 792, 798 [236 P.2d 145]; *People* v. *Mahoney,* 201 Cal. 618, 627 [258 P. 607]; *People* v. *Sarazzawski,* 21 Cal.2d 7, 11 [161 P.2d 934]; see also *Rogers* v. *Richmond,* 365 U.S. 534, 540-541 [81 S.Ct. 735, 5 L.Ed.2d 760]; *Cooper* v. *Superior Court,* 55 Cal.2d 291, 302 [10 Cal.Rptr. 842, 359 P.2d 274]; *People* v.

*Rogers,* 56 Cal.2d 301, 307 [14 Cal.Rptr. 660, 363 P.2d 892] ; *People* v. *Brommel,* 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845] ; *People* v. *Trout,* 54 Cal.2d 576, 585 [6 Cal.Rptr. 759, 354 P.2d 231] ; *People* v. *Holmes,* 54 Cal.2d 442, 443-444 [5 Cal.Rptr. 871, 353 P.2d 583].)

█ It is contended, however, that under the instructions given in this case the jury could have reached a verdict of first instead of second degree murder only by rejecting the evidence of manslaughter and that therefore the jury passed on every material issue presented by the evidence. This contention was forcefully advanced in the dissenting opinion in the *Carmen* case. There is no basis for distinguishing the present case from the *Carmen* case in this respect. It is therefore settled that defendant's right to a manslaughter instruction when there is evidence thereof precludes not only our weighing that evidence to determine the likelihood that a properly instructed jury would have found manslaughter, but also our attempting to determine how the failure to present the issue of manslaughter to the jury may or may not have influenced its choice between first and second degree murder. Since we do not know what effect an instruction that the jury could return a verdict of manslaughter would have had on its deliberations, we cannot conclude that it necessarily rejected the evidence of manslaughter. Defendant was entitled to a jury trial on all of the issues presented by the evidence, and that right he was denied.

Since the judgment must be reversed, we shall consider other contentions that may arise on retrial.

█ There is no merit in defendant's contention that the court erred in failing to give certain instructions on its own motion. Relying upon *People* v. *Carnine,* 41 Cal.2d 384 [260 P.2d 16], defendant urges that the jury should have been instructed that the homicide would not be first degree if the act or intent sexually to molest or rape arose after the act of striking the girls. In the *Carnine* case, however, there was evidence tending to show that the defendant did not decide to steal the victim's property until after the conclusion of the lethal assault. The evidence in the present case clearly establishes that the homicide and the felony, if any, were part of one continuous transaction. Defendant's own statement reflects that he had intercourse with Connie at some point between the Mack home and the drainage ditch, and since the immediate cause of Connie's death was drowning, such act

must have taken place before the completion of the homicide. (*People* v. *Mason*, 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025].)

Defendant contends that the court should have instructed the jury that an inference unfavorable to the prosecution could be drawn from the failure to introduce Connie's underpants into evidence. Defendant contends that the condition of the underpants was vital to the prosecution's theory that the killings were perpetrated in the course of a sexual attack. The record shows, however, that the prosecution introduced testimony with regard to the finding of the underpants and that defendant had a full opportunity to determine their condition on cross-examination. Having failed to raise any suspicion that the introduction of this evidence would have been adverse to the prosecution's case, defendant cannot now assert that the court erred in failing to give an instruction that was neither requested by defendant nor warranted by the evidence.

Defendant contends that the trial court erred in refusing to allow Dr. Zonnis to explain the use of hypnosis as an analytical tool, and in excluding a tape recording of statements made by defendant while under hypnosis. Dr. Zonnis was allowed to state her opinion as to defendant's intent at the time he entered the Mack house and at the time defendant struck the girls. She testified repeatedly that she based her opinion on what defendant had told her and upon her pyschiatric evaluation of him. At no time was she precluded from considering information derived from defendant while he was under hypnotic trance. Indeed, on cross-examination, Dr. Zonnis testified that she based her opinion "On the interviews that I had with him, the consistency of his responses, and on the information that corroborated what he had previously said that I obtained in the hypnotic interviews with him."

It was error, however, to exclude Dr. Zonnis' proffered explanation of hypnotic techniques as they are used in a psychiatric examination as a basis for her expert opinion. The evidence was clearly admissible for that purpose. (*People* v. *Brown*, 49 Cal.2d 577, 585 [320 P.2d 5].)

Although the tape recording of defendant's statements while under hypnosis might properly have been excluded in the exercise of the trial court's discretion to weigh its probative value as part of the basis for the expert's opinion against the risk that the jury might improperly consider it

as independent proof of the facts recited therein, the record shows that the trial court did not exercise this discretion, but erroneously concluded that *People* v. *Busch,* 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314], required exclusion of the evidence. In the *Busch* case we held that the trial court did not err in excluding an expert's opinion based in part upon an hypnotic examination on the ground that no proper foundation had been laid to show the reliability of hypnosis as an analytical tool or that the expert was qualified in its use for that purpose. In the present case, however, Dr. Zonnis was qualified as an expert psychiatrist. The defense offered to prove that hypnosis is an accepted analytical tool in the psychiatric profession in determining a person's state of mind, and Dr. Zonnis was allowed to state her opinion based in part on the hypnotic examinations. Under these circumstances, there is nothing in the *Busch* case that would preclude introducing in evidence all of the data on which she based her opinion. The court therefore erred in failing to exercise its discretion in determining whether the recording should be admitted.

Defendant contends that he was improperly interrogated and subjected to ''psychological coercion'' by the investigating officers in the absence of counsel as a result of which he was tricked into stating that he had intercourse with Connie. Defendant was allowed to consult with his attorney before the statement in question was made, and was advised by him that he could speak to the officers if he wished. When first taken into custody he claimed to have no knowledge of the killings. Gradually during the course of questioning the story emerged, consistent with the physical evidence. The evidence suggested the possibility of a sex crime, and defendant was asked whether he had intercourse with Connie. He first denied it, but when later asked if there was anything else he wished to say, he stated that he thought he had intercourse with Connie between the house and the drainage ditch. Although psychological coercion may render an admission or confession involuntary, the record in this case falls far short of showing such coercion.

Defendant contends that the trial court erred in allowing photographs and slides of the victims to be introduced into evidence, arguing that since there was no doubt as to the nature of the injuries inflicted, the photographs and slides served solely to inflame the jurors. Defendant concedes that

the pictures served to illustrate the testimony of the witnesses. Clearly the pictures were relevant; whether their probative value was outweighed by any probable prejudicial effect was a question addressed to the court's discretion. (*People* v. *Kendrick*, 56 Cal.2d 71, 91 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Ditson*, 57 Cal.2d 415, 446 [20 Cal.Rptr. 165, 369 P.2d 714].) In the exercise of that discretion, the trial court overruled defendant's objection to the introduction of the pictures on the grounds that they tended to refute the contention that defendant had intended merely to scare the girls and were relevant to the question of the degree of the crimes.

 Defendant contends that the prosecutor was guilty of prejudicial misconduct in several instances. Defendant complains that the prosecutor stated his personal belief in defendant's guilt. It appears, however, that the prosecutor's remarks were responsive to defense counsel's argument that the respective counsel were partisans charged with the responsibility of representing a point of view. The challenged remarks were a fair summary of the prosecutor's duties as a "partisan," and were a permissible response to argument of counsel. (See *People* v. *Osslo*, 50 Cal.2d 75, 102-103 [323 P.2d 397].)

 Some merit must be conceded to defendant's contention that the prosecutor unfairly attacked defendant's psychiatric witness, Dr. Zonnis. Although the area of permissible comment is wide (*People* v. *Mason*, 184 Cal.App.2d 317, 364 [7 Cal.Rptr. 627]), the prosecutor's comments, in at least one instance,* went beyond the limits of fair comment.

 Defendant also urges that the prosecution committed misconduct during the trial on the issue of penalty by appealing to racial prejudice and by arguing that the victims were of good character. The record, however, does not show an appeal to racial prejudice. Defendant argues that good or bad character of the deceased is not relevant or admissible unless it is in issue, as, for instance, under a plea of self-defense, and that the purpose of evidence of the girls' good character could therefore have been offered only to inflame the jury. Under Penal Code section 190.1 however, "Evidence may be presented . . . of any facts in aggravation or mitiga-

---

*Referring to Dr. Zonnis' qualifications as a consulting psychiatrist with the Palm Springs School District, the prosecutor stated: "This is the lady that is going to take care of our children in this county. This is the type of thing that concerns me. Are we going to have this type of situation?"

tion of the penalty." Evidence that the victims were innocent children was properly admitted under this rule. (*People* v. *Bentley,* 58 Cal.2d 458, 460 [24 Cal.Rptr. 685, 374 P.2d 645].)

 Conceding that the evidence of minimum, average and maximum terms served by persons sentenced to life imprisonment for first degree murder is admissible (*People* v. *Purvis,* 52 Cal.2d 871, 884 [346 P.2d 22]) defendant contends that the court erred in allowing the introduction of parole statistics on the ground that those statistics were based upon the number of persons released during the period 1950-1959. Such data, it is argued, are irrelevant to the present case because they do not take into consideration persons who are not released or the prior record of a prisoner. Although the statistics were not wholly applicable to this defendant, neither were they wholly irrelevant. On cross-examination, the witness explained that the figures did not include the time spent in prison by persons who had not been released and acknowledged that he had no figures or tables showing the average terms served by recidivists. Thus it appears that any misunderstanding of the statistics that might have been adverse to defendant was cured by the explanation elicited from the witness on cross-examination.

The judgment is reversed.

Gibson, C. J., Peters, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.—I dissent from the broad holding of the majority (*ante* p. 730) ˉ that reversal is "required" in the case at bench "because the defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] [r]egardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right *cannot be cured by article VI, section 4½ of the California Constitution. . . .*" (Italics added.)

I must also dissent from the majority's narrower holding (*ante* p. 731), assertedly based on *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [5]-774 [6] [228 P.2d 281], that "defendant's right to a manslaughter instruction when there is evidence thereof *precludes* not only our weighing that evidence to determine the likelihood that a properly instructed jury would have found manslaughter, but also *our attempting*

*to determine how the failure to present the issue of man-slaughter to the jury may or may not have influenced its choice between first and second degree murder."* (Italics added.)

A mere reading of *Carmen* discloses that its holding does not support the proposition for which the majority now cite it but to the extent that any language found in *Carmen's* majority opinion may appear, or be deemed, to support today's drastic revision in application of article VI, section 4½, of our Constitution, I would disapprove or overrule such interpretation. Certainly four members of this court did not in the cited case envisage propagating any such extreme change in the clearly worded subject section and no authority validly supporting such a departure was cited. I document this statement *infra* at a more appropriate place.

The above quoted excerpts from the majority opinion appear to declare full circle retrogression to a concept of Supreme Court duty which had been prevalent before our Constitution was amended in 1911 by addition of section 4½ to article VI.[1] By the amendment, in order to stop what apparently had been widely regarded as a sapping of the deterrent effect of criminal law (with coordinate encouragement of potential crimes) through technical reversals of convictions, and to promote more efficient administration of criminal justice, the court was relieved of a provision which it had interpreted to require such reversals. More specifically, under the amendment the *People*[2] *were given a constitutional right* to have this court refrain from setting aside *any* judgment or

---

[1] As adopted October 10, 1911, the subject section was applicable only *"in any criminal case"*; in its present form, applicable *"in any case,"* it was adopted November 3, 1914.

[2] And this means not so much the State of California as a political entity, but the innocent citizens who live and work here and are entitled to the law's effective protection; e.g., the small businessman who keeps his grocery store open in evening hours (*People* v. *Gaines* (1962) 58 Cal. 2d 630 [25 Cal.Rptr. 448, 375 P.2d 296]); the neighborhood liquor store owner (*People* v. *Bentley* (1962) 58 Cal.2d 458 [24 Cal.Rptr. 685, 374 P.2d 645]); the night janitor at a café (*People* v. *Deptula* (1962) 58 Cal.2d 225 [23 Cal.Rptr. 366, 373 P.2d 430]); the gas station attendant on duty at night (*People* v. *Hughes* (1961) 57 Cal.2d 89 [17 Cal.Rptr. 617, 367 P.2d 33]); casual restaurant patrons (*People* v. *Welch* (1962) 58 Cal.2d 271 [23 Cal.Rptr. 363, 373 P.2d 427]) and tavern patrons (*People* v. *Lessard* (1962) 58 Cal.2d 447 [25 Cal.Rptr. 78, 375 P.2d 46]); a husband and wife at home in bed (*People* v. *Seiterle* (1961) 56 Cal.2d 320 [14 Cal.Rptr. 681, 363 P.2d 913]); police officers whether making an arrest or stopping to help a motorist whose car has apparently broken down (*People* v. *Terry* (1962) 57 Cal.2d 538 [21 Cal.Rptr. 185, 370 P.2d 985]); and the little girl victims of the defendant here.

granting *any* new trial "on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for *any* error as to *any* matter of pleading, or for *any* error as to *any* matter of procedure, unless, after an examination of the entire cause, *including the evidence,* the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Italics added.)

Prior to the adoption of section 4½ of article VI this court, not without reason, had stated the controlling rule (based on its limited jurisdiction as then conferred by section 4) as follows: "[I]t is important that the laws should be enforced, so as to render as certain as possible the conviction of those guilty of their infraction. With every disposition on the part of the Judges to do this, the effort frequently fails, because something is done or omitted which contravenes some arbitrary or technical right of the prisoner. Courts have no power in criminal cases [by reason of the words of limitation in § 4 of art. VI] to affirm a judgment, merely because the Judges are persuaded that upon the merits of the case the judgment is right. If any error intervenes in the proceeding, it is presumed to be injurious to the prisoner, and generally he is entitled to a reversal of the judgment, for it is his constitutional privilege to stand upon his strict legal rights, and to be tried according to law. And yet it very often happens that the matter of exception taken by him serves no other purpose than to defeat justice." (*People* v. *Williams* (1861) 18 Cal. 187, 194.)

Section 4 of article VI is generally definitive of the jurisdiction of the Supreme Court. The court, it appears, had believed that the limited jurisdiction in criminal case appeals then provided by that section required reversal almost automatically on discovery of any substantial error. Section 4 (Constitution of 1849, as revised in 1879) provided that "The Supreme Court shall have appellate jurisdiction in all cases in equity [with exceptions not here material] . . . ; also, in all cases at law [with exceptions not here material] . . . ; also in cases of forcible entry and detainer [and other civil proceedings and probate matters] . . . ; also, in all criminal cases prosecuted by indictment, or information in a court of record *on questions of law alone.*" (Italics added.) The fact which the court found to be significant was the inclusion solely in this clause defining jurisdiction over criminal case appeals of the limiting phrase "on questions of law alone." It is significant that the first amendment to section 4 (adopted in

738

1911) added 4½ substantially in its present form but applicable only to criminal case appeals.

Subsequent to adoption of section 4½ of article VI, and obedient to the judicial duty there declared, this court in contrast to the above stated concept held that "Prejudice is no longer presumed, but substantial injury, as well as error, must be made affirmatively to appear before a judgment of conviction will be set aside." (*People* v. *McGann* (1924) 194 Cal. 688, 696 [8] [230 P. 169].) And again in *People* v. *Hoffman* (1926) 199 Cal. 155, 162 [8] [248 P. 504], "Since the adoption of section 4½ of article VI of the Constitution injury or prejudice cannot be presumed from the mere fact of error. To justify a reversal on appeal such injury or prejudice *must affirmatively appear* from an inspection of the record." (Italics added.) (See also *People* v. *Watson* (1956) 46 Cal.2d 818, 835-837 [12] [299 P.2d 243] ; *People* v. *O'Bryan* (1913) 165 Cal. 55, 63-65 [130 P. 1042].)

But indisputably departing from the above quoted unequivocal recognition of constitutionally imposed duty, the majority today say that, because of an *error in instructions,* "Regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right [to an instruction on manslaughter] cannot be cured by article VI, section 4½. . . ."

The majority purport to bring their holding within the scope of article VI, section 4½, by asserting (*ante,* p. 730 that "the denial of such a right [i.e., "to have the jury determine every material issue presented by the evidence"] itself is a miscarriage of justice within the meaning of that provision." But there is no support for such a construction in the language of article VI, section 4½. Certainly an error in instructing a jury—whether by noninstruction or misinstruction—may, in the circumstances defined by section 4½, effect a miscarriage of justice. But the constitutional provision expressly envisages that a "miscarriage of justice" as the phrase is there used may be found only "after an examination of the entire cause, including the evidence. . . ." Here the majority refuse to undertake such an examination, saying that "Regardless of how overwhelming the evidence of guilt may be" the subject error "cannot be cured by" the constitutional provision. This, it appears to me, constitutes simply an indirect method of acknowledging that article VI, section 4½, has been given no effect in this case.

Moreover, the choice of authorities cited (i.e., *People* v. *Mc-*

*Kay* (1951) 37 Cal.2d 792, 798 [4] [236 P.2d 145]; *People* v. *Mahoney* (1927) 201 Cal. 618, 627 [5] [258 P. 607]; *People* v. *Sarazzawski* (1945) 27 Cal.2d 7, 11 [1a-2] [161 P.2d 934]) shows that in fact the majority are here endeavoring to invoke the qualification that "When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand." (*Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 302 [13] [10 Cal.Rptr. 842, 359 P.2d 274], quoting from *People* v. *Sarazzawski* (1945), *supra*, 27 Cal.2d 7, 11 [1a].) I have no quarrel with that qualification if it is properly understood and applied; but the plain fact is that *it is inapplicable to the type of case now before us.* What, precisely, is the error that the majority find to have been committed here ? It is said (*ante*, p. 727) that "It was error to refuse the instruction" on the issue of manslaughter because there was evidence of that offense deserving of consideration. Thus the majority hold that the trial court *erred in refusing to give an instruction* on a matter that should, on the evidence, have been submitted to the jury. To be sure, one can imagine a condition of the evidence in which this instruction could be an important one; yet such an error has never, until today, been thought to fall within the *Sarazzawski* "due process" qualification to article VI, section 4½, of our Constitution. In none of the cases listed by the majority (*ante*, pp. 730-731) was the reversible error one involving a failure or refusal to instruct, and no such case has been cited by the parties or discovered through independent research.[3]

As just noted (fn. 3) two of the decisions relied on by the majority (*McKay* and *Mahoney*) hold that article VI, sec-

---

[3]Three of the cases cited by the majority involved the use of involuntary confessions (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-541 [81 S.Ct. 735, 5 L.Ed.2d 760]; *People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [1] - 634 [4] [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [1] - 585 [6] [6 Cal.Rptr. 759, 354 P.2d 231]), two involved denial of a reasonable opportunity to prepare to argue a motion (*Cooper* v. *Superior Court* (1961), *supra*, 55 Cal.2d 291, 302 [11] - 303 [14]; *People* v. *Sarazzawski* (1945), *supra*, 27 Cal.2d 7, 12 [3] - 18 [16]), two involved denial of a fair trial by reason of the bias of judge or jury (*People* v. *McKay* (1951), *supra*, 37 Cal.2d 792, 793 [1] - 798 [4]; *People* v. *Mahoney* (1927) *supra*, 201 Cal. 618, 621 [4] - 627 [5]), and the remaining two involved entry of a stipulated plea of guilty by defendant's counsel (*People* v. *Rogers* (1961) 56 Cal.2d 301, 305 [1]-307 [5] [14 Cal.Rptr. 660, 363 P.2d 892]) and improper waiver of jury trial (*People* v. *Holmes* (1960) 54 Cal.2d 442, 443-444 [1] [5 Cal. Rptr. 871, 353 P.2d 583]).

tion 4½, will not save a judgment when the defendant has been deprived of a fair and impartial judge and jury. (See also *People* v. *Barrett* (1929) 207 Cal. 47, 49 [1] [276 P. 1003]; *People* v. *Carmichael* (1926) 198 Cal. 534, 547 [5] [246 P. 62]; *People* v. *Mason* (1946) 72 Cal.App.2d 699, 703 [1] - 716 [16b] [165 P.2d 481]; *People* v. *Wismer* (1922) 58 Cal.App. 679, 687-688 [3] [209 P. 259]; but cf. *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 201 [15] - 203 [18] [288 P.2d 12, 289 P.2d 242].) *A fortiori*, the constitutional provision would not cure an outright denial of the right to jury trial (Cal. Const., art. I, § 7); as observed in *People* v. *O'Bryan* (1913), *supra*, 165 Cal. 55, 65-66, "if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt." (Cf. *Farrell* v. *City of Ontario* (1919) 39 Cal.App. 351, 359 [178 P. 740].) The majority imply that an erroneous failure or refusal to instruct is somehow the equivalent of a denial of the right to trial by jury; indeed, this implication is explicitly drawn in the majority's statement (*ante*, p. 731) that "Defendant was *entitled to a jury trial* on all of the issues presented by the evidence, and that right he was denied." (Italics added.) But the absurdity of such an equation is apparent.[4] The majority seek to circumvent this absurdity by speaking rather of a denial of defendant's "constitutional right to have the jury determine every *material* issue presented by the evidence." (Italics added.) But does this really differ from a denial of defendant's statutory right to correct and complete instructions?[5] That there is in fact no such difference is made plain by the majority's conclusion, quoted hereinabove, that "Defendant was entitled to a jury trial on *all* of the

---

[4]For example, why would not the same reasoning apply to an erroneous rejection of evidence offered by the defendant on his behalf? After all, if the defendant's evidence on a particular issue is excluded, that issue will not be submitted to the jury to that extent and defendant will be "denied a jury trial" accordingly. The fallacy in such an argument does not need elaboration.

[5]Penal Code section 1127 provides in relevant part: "The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses. Either party may present to the court any written charge on the law, but not with respect to matters of fact, and request that it be given. If the court thinks it correct and pertinent, it must be given; if not, it must be refused." (See also Pen. Code, § 1093, subd. 6.)

issues presented by the evidence, and that right he was denied." (Italics added.)

It therefore appears from the language of the opinion itself that the majority propose to hold that a failure or refusal to instruct upon any of "the issues presented by the evidence" (*ante*, p. 731) is an error that "cannot be cured by article VI, section 4½, of the California Constitution" (*ante*, p. 730). To state the holding is to refute either it or the integrity of section 4½. The constitutional provision by its very terms applies to all reversals "on the ground of misdirection of the jury. . . ." In recognition of this fact we have held, in a long line of decisions unbroken until today, that an erroneous failure or refusal to instruct will not be cause for reversal "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 4½.) This constitutional mandate has been obeyed in the following illustrative cases, among many:

1. Erroneous failure to instruct that it is the duty of the jury to weigh the circumstances surrounding the defendant's confession and to disregard it if they find it to be the result of coercion. (*People* v. *Bevins* (1960) 54 Cal.2d 71, 76 [3] - 78 [8] [4 Cal.Rptr. 504, 351 P.2d 776]; *People* v. *Gonzales* (1944) 24 Cal.2d 870, 877-878 [5] [151 P.2d 251].)

2. Erroneous failure to instruct (Code Civ. Proc., § 2061, subd. 4) that evidence of oral admissions of a defendant is to be viewed with caution. (*People* v. *Carswell* (1959) 51 Cal. 2d 602, 608 [12]—609 [13] [335 P.2d 99]; *People* v. *Riley* (1950) 35 Cal.2d 279, 286 [4] [217 P.2d 625]; *People* v. *Letourneau* (1949) 34 Cal.2d 478, 492-493 [9] [211 P.2d 865]; cf. *People* v. *Terry* (1962) 57 Cal.2d 538, 565 [27] [21 Cal. Rptr. 185, 370 P.2d 985].)

3. Erroneous failure to instruct that guilt cannot be established by confessions or admissions alone, and that in such cases there must be independent proof of the corpus delicti. (*People* v. *Howk* (1961) 56 Cal.2d 687, 706 [19] - 707 [20] [16 Cal.Rptr. 370, 365 P.2d 426]; *People* v. *Holbrook* (1955) 45 Cal.2d 228, 234 [9-10] [288 P.2d 1].)

4. Erroneous failure to instruct that in prosecutions for sex offenses the testimony of the prosecuting witnesses is to be examined with caution. (*People* v. *Wein* (1958) 50 Cal.2d 383, 406 [32-34] [326 P.2d 457]; *People* v. *Nye* (1951) 38

Cal.2d 34, 40 [7] - 41 [9] [237 P.2d 1]; *People* v. *Putnam* (1942) 20 Cal.2d 885, 890 [3] - 893 [5] [129 P.2d 367]; *People* v. *Stangler* (1941) 18 Cal.2d 688, 693-694 [5] [117 P. 2d 321].)

5. Erroneous failure to instruct that in prosecutions for unlawful possession of narcotics, knowledge of the object's narcotic character is an essential element of the offense charged. (*People* v. *Winston* (1956) 46 Cal.2d 151, 158 [9] - 161 [12] [293 P.2d 40]; accord, *People* v. *Perez* (1954) 128 Cal.App. 2d 750, 759-760 [12] [276 P.2d 72].)[6]

6. Erroneous failure to instruct that, on the evidence introduced, a codefendant was an accomplice as a matter of law. (*People* v. *Barclay* (1953) 40 Cal.2d 146, 152-153 [5] [252 P.2d 321].)

7. Erroneous failure to instruct (Pen. Code, § 1111) that a conviction cannot be had upon accomplice testimony unless it be corroborated. (*People* v. *Bevins* (1960), *supra*, 54 Cal. 2d 71, 76 [1] - 78 [8]; *People* v. *Davis* (1954) 43 Cal.2d 661, 673 [17a] - 674 [20] [276 P.2d 801].)

8. Erroneous failure to instruct (Code Civ. Proc., § 2061, subd. 4) that the testimony of an accomplice ought to be viewed with distrust. (*People* v. *Dail* (1943) 22 Cal.2d 642, 653 [5] - 659 [15] [140 P.2d 828]; accord, *People* v. *Jackson* (1961) 197 Cal.App.2d 165, 171-172 [1] [17 Cal.Rptr. 113]; *People* v. *Ahern* (1952) 113 Cal.App.2d 746, 748 [1] - 749 [4] [249 P.2d 63].)[7]

9. Erroneous failure to instruct (see Pen. Code, § 1096) that when the evidence is sufficient to support a finding of guilt

---

[6]See also the decisions of the District Courts of Appeal holding that article VI, section 4½, is applicable to an erroneous failure to instruct that specific intent is an essential element of the crime of robbery (*People* v. *Seay* (1960) 179 Cal.App.2d 362, 363 [1] [3 Cal.Rptr. 769]; *People* v. *Butcher* (1959) 174 Cal.App.2d 722, 730-733 [11] [345 P.2d 127]; *People* v. *McPhillips* (1957) 149 Cal.App.2d 687, 690-691 [3] [308 P.2d 929]), an erroneous failure to instruct (Pen. Code, § 22) that where the existence of a specific intent is an essential element of the offense charged, the jury in determining that intent may take into consideration evidence that the defendant was intoxicated at the time he acted (*People* v. *Arriola* (1958) 164 Cal.App.2d 430, 434 [3a] - 437 [6] [330 P.2d 683]); *People* v. *Norwood* (1940) 39 Cal.App.2d 503, 504-506 [1] [103 P.2d 618]; *People* v. *Fellows* (1923) 63 Cal.App. 557, 561 [4-5] [219 P. 80]), and an erroneous failure to instruct (Pen. Code, § 1127b) that the jury are not bound to accept the testimony of an expert witness as conclusive (*People* v. *Morris* (1952) 110 Cal.App.2d 469, 478 [16] [243 P.2d 66]; *People* v. *DeWitt* (1950) 98 Cal.App.2d 709, 717-718 [3] [220 P.2d 981]).

[7]This is also the rule in the federal courts. (See, e.g., *Mims* v. *United States* (9th Cir. 1958) 254 F.2d 654, 656-658 [2]; *Papadakis* v. *United States* (9th Cir. 1953) 208 F.2d 945, 954 [13, 14], and cases there cited.)

of both the offense charged and lesser included offense, the jury must find the defendant guilty of the lesser if they entertain a reasonable doubt as to which offense was committed. (*People* v. *Dewberry* (1959) 51 Cal.2d 548, [2] - 558 [8b] [334 P.2d 852].)

10. Erroneous failure to instruct (see Pen. Code, § 1096) that where circumstantial evidence is relied upon to sustain a conviction, it must be irreconcilable with any rational conclusion other than guilt. (*People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [1] - 50 [5] [286 P.2d 1]; *People* v. *Bender* (1945) 27 Cal.2d 164, 174 [1] - 177 [4] [163 P.2d 8].)

11. Erroneous failure to instruct (see Pen. Code, § 1096) that if evidence is susceptible of two equally reasonable inferences as to innocence or guilt, the jury must adopt the former. (*People* v. *Simeone* (1945) 26 Cal.2d 795, 806 - 807 [8] [161 P.2d 369], and cases there cited; accord, *People* v. *Romero* (1957) 156 Cal.App.2d 48, 50 [3] - 51 [4] [318 P.2d 835].)

12. Erroneous failure to instruct on the defendant's evidence of alibi. (*People* v. *Foster* (1926) 198 Cal. 112, 127 [11] - 128 [12] [243 P. 667];[8] accord, *People* v. *Hickok* (1961) 198 Cal.App.2d 442, 446 [6a] - 448 [6b] [17 Cal.Rptr. 875]; *People* v. *Bagley* (1955) 133 Cal.App.2d 481, 485-486 [3] [284 P.2d 36]; *People* v. *Jackson* (1954) 125 Cal.App.2d 776, 780-781 [6] [271 P.2d 196]; cf. *People* v. *Rosoto* (1962) 58 Cal. 2d 304, 353-355 [46] [23 Cal.Rptr. 779, 373 P.2d 867].)

13. Erroneous failure to instruct that the verdicts of the jury as to guilt, degree of the offense, and penalty must be unanimous. (*People* v. *Kelso* (1945) 25 Cal.2d 848, 851 [2a] - 853 [2b] [155 P.2d 819].)

14. Erroneous failure, in informing the jury of the statutory minimum term of a "life" sentence, to instruct on evidence of practices of the Adult Authority whereby a convict will ordinarily serve a longer term than that minimum

---

[8]Thus in denying an application for hearing in *People* v. *Visconti* (1916) 31 Cal.App. 169, 172 [160 P. 410], this court stated that "we deem it proper to say that we are not to be understood as intimating that the refusal to give such an instruction [i.e., on alibi] as was refused in this case would in all cases be deemed by us sufficient cause for reversal. Especially is this true in view of the provisions of section 4½ of article VI of the Constitution.

"In denying the application for hearing in this court we assume that the district court of appeal concluded, in view of the circumstances of this particular case as shown by the record, that the refusal of the trial court to permit the requested instruction operated substantially to the prejudice of the defendant."

(*People* v. *Jackson* (1963) *ante,* pp. 375, 378-379 [1] [29 Cal. Rptr. 505, 379 P.2d 937].)

These authorities (and many others) are indistinguishable in principle from the case at bench. It cannot be said that the issue on which there was a failure to instruct in the case before us was somehow more ''material'' than, for example the issue of the voluntariness of a defendant's confession (*Bevins*), the weight to be accorded to the testimony of a prosecuting witness on whose uncorroborated word alone a defendant may be convicted of a serious sex offense (*Wein*), or the defendant's burden of proof in seeking to establish an alibi (*Foster*). A resolution of any of the latter issues favorable to the defendant could result in his being found not guilty of *any* crime; but in the case at bench a favorable finding on the subject issue (i.e., manslaughter as an included offense) could result at best in defendant's being found guilty of the crime of manslaughter. Hence the subject issue is by definition less ''material'' (in the only sense of the word that is meaningful to defendant) than a number of those on which there was a failure to instruct in the above cited cases. Yet in none of those instances was it held, as the majority today hold, that the erroneous failure or refusal to instruct on the issue in question ''cannot be cured by article VI, section 4½, of the California Constitution'' (*ante,* p. 730). Such a holding is wholly unprecedented, and if taken at its face value will constitute a long step backwards to the nineteenth-century era of ''presumed prejudice'' in the administration of criminal justice in the appellate courts of this state.

Turning to the majority's narrower holding, it is stated (*ante,* p. 730) that ''In *People* v. *Carmen* [1951], *supra,* we held it *reversible* error to refuse a manslaughter instruction when there is any evidence that would warrant a conviction of manslaughter. (36 Cal.2d at pp. 773-774.)'' (Italics added.) The majority, however, fail to point out that the language, which inferentially they deem to support the proposition for which they invoke *Carmen,* has been lifted from context; that the context is essentially material to any relevancy of the language to the issues here; and further, that *in context* the holding of *Carmen* is supportive *not* of the majority thesis but of this dissent.

Perusal of the *Carmen* (1951) decision reveals that reversal of the judgment imposing the death penalty for first degree murder was based *not* on mere refusal to give a manslaughter instruction in a case wherein the jury had found murder

in the first degree after having been fully and correctly instructed on both first and second degree murder. By contrast, in *Carmen* it appears that on the instructions as there given the only intelligible choice the jury had was guilty of murder in the first degree or not guilty. There is a parenthetical statement (p. 777 of 36 Cal.2d) that "It [the jury] had to find him guilty of murder (first or second degree) or acquit him," but this mention of a second degree murder alternative is qualified by the express holding on the same page that "The instruction as given leaves no ground for the classification of murder of the second degree."

The pertinent portion of the decision in this respect is as follows (p. 777 [11] of 36 Cal.2d): "In addition to the error in failing to instruct on the subject of involuntary manslaughter, the court erred in giving the following instruction: 'There need be, however, no considerable space of time devoted to deliberation or between the formation of the intent to kill and the act of killing. It is only necessary that the act of killing be preceded by, and be the result of a concurrence of will, deliberation and premeditation on the part of the slayer to constitute murder in the first degree, regardless of how rapidly or slowly these mental processes succeed each other or how quickly or tardily they are followed by the act of killing,' and in refusing to give an instruction offered by defendant defining 'deliberate' and 'premeditated' as set forth in *People* v. *Bender,* 27 Cal.2d 164, 183 [163 P.2d 8]. The word 'considerable,' used as an adjective, means 'Worthy of consideration; of importance or consequence.' (Webster's New Inter. Dict. (1943).) *The instruction as given leaves no ground for the classification of murder of the second degree.* [Italics added.] (*People* v. *Honeycutt,* 29 Cal.2d 52, 60 [172 P.2d 698]; *People* v. *Bender, supra,* pp. 182-185; see, also, *People* v. *Valentine,* 28 Cal.2d 121, 134 [169 P.2d 1].)" It is not without significance that the justice penning this dissent was the author of the majority opinion in each of the cases last above cited in the quotation from *Carmen;* i.e., *People* v. *Bender* (1945), *People* v. *Honeycutt* (1946), and *People* v. *Valentine* (1946).

It was further held in *Carmen* (*id.* at p. 778 [12]) that the giving of another instruction which in itself was correct, "under the circumstances, does no more than create a conflict with the incorrect instruction and we cannot speculate on which of the conflicting instructions the jury followed. [Citations.]" By reason of the court's holding that "*The instruc-*

*tion* [relating to first and second degree murder] *as given leaves no ground for the classification of murder of the second degree*'' (italics added), it is manifest that the failure to give any instruction whatsoever on manslaughter acquired far greater significance than it otherwise would have had. ''[I]t is elementary that the language used in any opinion is to be understood in the light of the facts and the issue then before the court.'' (*Eatwell* v. *Beck* (1953) 41 Cal.2d 128, 136 [8] [257 P.2d 643]; *McDowell & Craig* v. *City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38 [4] [4 Cal.Rptr. 176, 351 P.2d 344].)[9] The language excerpted by the majority from *Carmen*, when considered in context, manifestly is not authority for the majority's holding in the case at bench.

Inasmuch as the majority rely so heavily on selected language from *Carmen* it seems appropriate to point out also that of the seven decisions purportedly relied on for such language as the majority in the case at bench appear to emphasize in *Carmen*, two (*People* v. *Hayes* (1908) 9 Cal.App. 301 [99 P. 386]; and *People* v. *Sidelinger* (1908) 9 Cal.App. 298 [99 P. 390]) were decided prior to the adoption in 1911 of article VI, section 4½, of our Constitution; and in none of the remaining five (*People* v. *Darrow* (1931) 212 Cal. 167 [298 P. 1]; *People* v. *Best* (1936) 13 Cal.App.2d 606 [57 P.2d 168]; *People* v. *Wallace* (1934) 2 Cal.App.2d 238 [37 P.2d 1053]; *People* v. *Wilson* (1916) 29 Cal.App. 563 [156 P. 377]; *People* v. *Carroll* (1912) 20 Cal.App. 41 [128 P. 4]) was there any discussion of the effect of that constitutional provision on the point in issue. Moreover, the decisions are plainly distinguishable from the case at bench on the ground (see pp. 786-787 of 36 Cal.2d) that where the jury are *properly instructed on both degrees* of murder and choose to convict the defendant of *second degree murder only*, a failure to instruct on evidence of manslaughter is prejudicial error *because it appears from the evidence, the instructions, and the verdict* that the defendant might reasonably have been convicted of manslaughter if instructions thereon had been

---

[9]It may also be noted that California never had jurisdiction over Carmen and the crime of which he had been convicted. For a further history of that case in California courts see *People* v. *Carmen* (1954, Cal.) 265 P.2d 900; *People* v. *Carmen* (1954, on rehearing) 43 Cal.2d 342 [273 P.2d 521]; *In re Carmen* (1957) 48 Cal.2d 851, 888 [313 P.2d 817; *Carmen* v. *Dickson* (1958) 355 U.S. 924 [78 S.Ct. 367, 2 L.Ed.2d 354]; *In re Carmen* (N.D. Cal. 1958) 165 F. Supp. 942, 951 [''The writ of Habeas Corpus will issue and it is Ordered that petitioner be discharged from custody.''].

given.[10] But where, as here, the jury are properly instructed on both degrees of murder and on the rule of reasonable doubt, and yet find the defendant guilty of first degree murder rather than second, *it appears from the evidence, the instructions, and the verdict* that the jury considered and rejected the evidence of manslaughter—for in the case at bench that evidence is identical with the evidence of second degree murder—and hence that the failure to instruct thereon cannot have been prejudicial.

Mr. Justice Spence reasoned in his dissenting opinion in *Carmen* (at pp. 785-786 of 36 Cal.2d) as follows: "It seems obvious that had the jury placed the slightest credence in either of defendant's conflicting versions concerning his claimed unintentional shooting of his victims, or even had the jury any reasonable doubt concerning his intentions, it would not have brought in a verdict finding defendant guilty of first degree murder and fixing the penalty at death. . . . The fact that the jury brought in a verdict finding defendant guilty of an offense higher than second degree murder . . . affirmatively shows that the jury rejected, in all material particulars, defendant's conflicting stories concerning his unintentional shooting of his victims, and determined, as the overwhelming evidence showed, that his offenses were intentionally committed and were preceded by deliberation and premeditation." The foregoing reasoning of Justice Spence *on the record as he interpreted it* is in accord with the decisions of the California courts prior to *Carmen* and with the general rule in our sister jurisdictions today. But, inferentially, the reason Justice Spence's opinion became a dissent instead of a majority decision, would seem to be that the majority of four in *Carmen* (which included the author of this dissent) were of the view that "The instruction [on murder] as given leaves no ground for the classification of murder of the second degree." (*People* v. *Carmen* (1951), *supra*, 36 Cal.2d 768, 777 [11].)

On a record such as that *assumed* by Justice Spence and

---

[10]It is noteworthy that even this proposition is supported, strictly speaking, only by the *Wilson* decision. In *Darrow* the relevant statement (at p. 184 [6] of 212 Cal.) is dictum because the jury were in fact fully instructed on manslaughter; in *Best* the defendant was charged with murder but convicted only of manslaughter; in *Wallace* the defendant was charged only with second degree murder and two vehicle violations; and in *Carroll* the defendant was charged with and convicted of grand larceny. *Hayes* and *Sidelinger*, as pointed out, were decided prior to the adoption of article VI, section 4½, of our Constitution.

*such as we actually have before us today,* the authorities are consistent and overwhelming in support of his dissent and this dissent.

*California Decisions.* In *People* v. *O'Neal* (1885) 67 Cal. 378, 379 [7 P. 790], the defendant was convicted of first degree murder and contended on appeal that it was prejudicial error to have instructed on first and second degree murder but not on manslaughter. This court rejected the contention stating as follows: "But conceding for the purpose of the argument that the instruction was erroneous in the concluding part of it [i.e., in instructing on second degree murder but not on manslaughter], the defendant was not prejudiced thereby, as the verdict of the jury was for murder in the first degree." The subject rule was more fully spelled out in *People* v. *Montezuma* (1931) 117 Cal.App. 125, 131-132 [2] [3 P.2d 370, 4 P.2d 285]. In that case the court instructed fully on the two degrees of murder, but gave no instruction defining the particular elements of manslaughter; and no form of verdict of manslaughter was among those submitted to the jury. The defendant was found guilty of first degree murder, and contended that it was prejudicial error to fail to adequately instruct on manslaughter and to submit a corresponding form of verdict to the jury. The court rejected the contention, pointing out the inadequacy of the evidence of manslaughter, and reasoning, in the alternative, that from the instructions given and the forms of verdict furnished and the fact that the jury "deliberately found the defendant guilty of the highest degree, it seems apparent the jury was not disposed to consider any crime in connection with the case except that of murder." This court denied a hearing.

Still more explicit is the unanimous opinion of this court in *People* v. *Manzo* (1937) 9 Cal.2d 594, 599-600 [4] [72 P.2d 119]. There the trial court instructed on both degrees of murder but refused to give any instruction on manslaughter. The defendant was found guilty of first degree murder, and contended that it was prejudicial error to refuse to instruct on manslaughter. This court rejected the contention, holding that although the issue of self-defense was present there was no evidence to warrant a conviction of manslaughter.[11]

---

[11]There was evidence that the deceased called the defendant insulting names immediately prior to the shooting, but the court disregarded that evidence on the theory that mere words cannot constitute provocation sufficient to reduce a homicide from murder to manslaughter. To that extent—but only to that extent—*Manzo* was overruled in *People* v. *Valentine* (1946) 28 Cal.2d 121, 137 [15a] - 144 [15b] [169 P.2d 1].

In the alternative, the court reasoned: "That the jury determined the killing was not upon any sudden heat of passion but with premeditation *is evident from its verdict.*" (Italics added.) The court then set forth the instructions on both degrees of murder and on intent to kill, and concluded: "With those instructions, the jury returned a verdict of murder *in the first degree. By refusing to reduce the crime to murder in the second degree, the jury found* that the defendant acted with the deliberate and clear intent which constitutes murder in the first degree." (Italics added.)

Again, in *People* v. *Boggs* (1938) 12 Cal.2d 27, 33, 34 [2] [82 P.2d 368], a defendant found guilty of first degree murder complained on appeal of an erroneous instruction on manslaughter. The trial court had instructed on second degree as well as first degree murder. Rejecting the defendant's contention, this court reasoned: "The latter portion of the instruction [i.e., the portion dealing with manslaughter], even if inaccurate, could not have prejudiced the defendant. *Particularly is this so, in view of the jury's verdict finding him guilty of murder of the first degree.* [Citations.] In other words, *judging from its verdict,* the jury was satisfied beyond a reasonable doubt that the prosecution had established the essentials of murder of the first degree, which essentials were correctly set forth in the instructions." (Italics added.) (Accord, *People* v. *Hashaway* (1945) 67 Cal.App.2d 554, 571-572 [5] [155 P.2d 101].)

To the same effect is *People* v. *Mitchell* (1939) 14 Cal.2d 237, 242 [1-2] [93 P.2d 121]. In that case the trial court instructed on both degrees of murder but refused to instruct on manslaughter. The defendant was found guilty of first degree murder and was given the death penalty. This court upheld the refusal to give manslaughter instructions on the ground of lack of evidence to raise the issue, and in the alternative reasoned as follows: "In support of his claim that the refusal to give this instruction was error and that it was prejudicial of his legal rights, the appellant argues that had such an instruction been given the jury under all the evidence might have found him guilty of manslaughter instead of murder. We find no force whatever in this argument. The jury was correctly and properly instructed respecting the decrees [degrees] of murder, and of its power to fix the punishment in case it found the defendant guilty of murder in the first degree. With these instructions before it, the jury found

the appellant guilty of murder in the first degree without recommending life imprisonment. If under the evidence and these instructions, the jury rendered a verdict calling for the death penalty, it is not reasonable to suppose that its verdict would have been different, had the proposed instruction on manslaughter been given."

Admittedly these authorities are not all four-square holdings on the issue; but their language, quoted herein, is strong evidence that the result reached today by the majority, is an undocumented, unwarranted and unjustifiable departure from the mainstream of California jurisprudence.

*Out of State Decisions.* The general rule in the United States is stated as follows: "Where the court instructed *on two degrees*[12] or grades of an offense, and the jury convicted accused of the higher degree or grade, the fact that the court did not instruct on a still lower degree or lesser crime is not reversible error." (Italics added.) (24B C.J.S., p. 230.)

In three unanimous decisions rendered at about the time that California was adopting article VI, section 4½, of our Constitution, the highest court of New York applied this general rule to a failure to instruct on manslaughter in a murder prosecution. First, in *People* v. *Granger* (1907) 187 N.Y. 67 [79 N.E. 833, 834], the trial court instructed on *both degrees of murder* but not on manslaughter. The defendant, found guilty of first degree murder, contended that it was prejudicial error to refuse to give any instruction on manslaughter. The New York Court of Appeals agreed that there was evidence "that, doubtless, was sufficient to bring [the homicide] within the definition of manslaughter in the first degree" and that the jury were authorized to "find the defendant not guilty of the degree charged in the indictment, but guilty of any of the degrees inferior thereto authorized by the evidence," including manslaughter. Yet the court held that on the facts and record before it any error in refusing to instruct on manslaughter must be deemed nonprejudicial, reasoning as follows: "Of course, the court could not coerce the jurors and force a conviction for a greater crime than they would otherwise have found him guilty of by withhold-

---

[12]In the case at bench, it must be remembered, the court did instruct "on two degrees" of the offense, while in *Carmen* it is law of the case on the face of the opinion that the court instructed *only on murder of the first degree*; i.e., it flatly refused to instruct on manslaughter and as to murder "The instruction as given leaves no ground for the classification of murder of the second degree." (*People* v. *Carmen* (1951) 36 Cal.2d 768, 777 [11] [228 P.2d 281].)

ing from their consideration a lesser degree authorized by the evidence. . . . But, as we have seen, the defendant was indicted, charged with the crime of murder in the first degree. This involved the intentional killing, with deliberation and premeditation, or . . . the killing with the intent to rob. The court submitted to the jurors the question as to the defendant's guilt under this charge, and *also instructed them as to the statutory definition of murder in the second degree,* and instructed them that, in case they entertained a reasonable doubt as to his guilt of the crime charged, they might determine the question as to his guilt of the lesser offense. The jurors, therefore, were not coerced into rendering a verdict in the first degree; for, under the charge of the court, they had the right to convict in the second degree. *The fact that they did not convict him of the lesser degree indicated that they had no doubt as to his guilt of the greater offense, and therefore the failure to instruct them that they had the right to convict of manslaughter in the first degree, a lesser degree than that of murder in the second degree, could not well have harmed the defendant."* (Italics added.)

In *People* v. *Serimarco* (1911) 202 N.Y. 225 [95 N.E. 553, 555 [3] ], the court instructed the jury at length on *both degrees of murder* but read only the statutory definition of manslaughter. The defendant, found guilty of first degree murder, contended that it was prejudicial error not to charge more fully on manslaughter. Rejecting this contention, the Court of Appeals reasoned: "The fact that the jury convicted the defendant of murder in the first degree is a sufficient answer to this contention. It is apparent that the defendant could not have been prejudiced by the failure of the trial justice to charge more fully upon the subject of manslaughter in the first degree; for the jury had the right to return a verdict of guilty of murder in the second degree, if in their judgment the evidence warranted such a verdict. *The fact that they did not find such a verdict precluded the possibility of finding a verdict based upon guilt of a still lower grade of homicide,* and thus it is evident that the failure of the learned trial justice to charge more fully upon the subject of manslaughter in the first degree was not of the slightest consequence in the case." (Italics added.)

And in *People* v. *Brown* (1911) 203 N.Y. 44 [96 N.E. 367, 369 [4], Ann. Cas. 1913 A 732], the court had instructed at length on *both degrees of murder* but had "simply para-

phrased very briefly that section of the statute which defines manslaughter in the first degree.'' The defendant, found guilty of first degree murder, contended that it was prejudicial error not to instruct more completely on manslaughter. The Court of Appeals rejected this contention, cited *People* v. *Granger* (1907), *supra*, 187 N.Y.67, and reasoned: ''This feature of the trial may . . . be summarily disposed of. The court had *correctly and fully charged as to the two degrees of murder.* Had the jury found the defendant guilty of murder in the second degree, there might be some ground for the assumption that the defendant's cause was prejudiced by the action of the court. Such a situation would have lent support to the claim that the jury might have declared the defendant guilty of a still lower degree of homicide, had they received proper instructions from the court. *All such speculations are dissipated, however, by the fact the defendant was found guilty of murder in the first degree. When the jury. excluded from the case the alternative of murder in the second degree, all lower degrees were necessarily eliminated by the same rule.''* (Italics added.)

These three decisions of the New York Court of Appeals have never been questioned. The law that they enunciate, moreover, has been invoked on numerous occasions in the intervening years and is today living law. Thus in *State* v. *Drosos* (1962) 253 Iowa 1152 [114 N.W.2d 526, 533 [22]], the trial court instructed on *both degrees of murder* but not on manslaughter. The defendant, found guilty of first degree murder, contended that it was prejudicial error to refuse to give manslaughter instructions. Rejecting this contention, the appellate court held in a unanimous opinion that the evidence of manslaughter was insufficient to warrant an instruction, and, in the alternative, that in any event ''The jury, in finding defendant guilty of first degree murder, rejected the second degree offense submitted. By rejecting the second degree or lesser offense, we fail to see how defendant was then prejudiced by a failure to submit manslaughter, a lesser offense than second degree murder.

''We so held in *State* v. *Troy* [1928] . . . 206 Iowa 859, 866 [220 N.W. 95, 98, 221 N.W. 370], in the following words: 'Appellant complains that his request for instruction on the law of manslaughter was not granted. . . . He [the court] also submitted the question of defendant's guilt of murder in the second degree. As the jury found the defendant guilty of a homicide of a higher degree than murder in the second de-

gree, which is above manslaughter, any error (as to the existence of which we do not inquire) in instructions on the subject of manslaughter was without prejudice.' '' (Accord, *State* v. *Woodmansee* (1930) 212 Iowa 596 [233 N.W. 725, 735 [15, 16]].)

The defendant in *State* v. *Clokey* (1961) 83 Idaho 322 [364 P.2d 159, 165-166 [8]], convicted of first degree murder, contended that the court prejudicially erred ''in failing to instruct the jury that the definition of involuntary manslaughter is also pertinent and applicable to the facts in this case.'' In a unanimous opinion the appellate court rejected this contention on the ground, among others, that where the jury have been instructed on ''one or more included offenses of an intermediate grade between the crime of which the defendant is convicted and the lesser offense which the court omitted or refused to submit to the jury, the omission or refusal is not error because the verdict indicates that the result would not have been different had the omitted requested instruction been given.'' (Accord, *State* v. *Owen* (1953) 73 Idaho 394 [253 P.2d 203, 212 [11]].) Specifically spelling out its application to the issue now before us, the same court reasoned in *State* v. *Ward* (1931) 51 Idaho 68 [1 P.2d 620, 622 [6]] that ''the action of the jury in finding appellant guilty of murder in the first degree, though instructed as to the elements of murder in the second degree, as an included offense, removed any question of prejudice with regard to the instructions on manslaughter, since, having found the appellant guilty of the greater offense, it is evident that they did not consider the appellant guilty of any lesser offense.''

In *Brown* v. *State* (1951) 219 Ark. 647 [243 S.W.2d 938, 939 [4-5]], it was held that where the jury were instructed on first degree murder and on voluntary manslaughter, and found the defendant guilty of first degree murder, ''[defendant] was not prejudiced by the court's failure to submit the still lesser offense of involuntary manslaughter.'' In *Outler* v. *State* (1922) 154 Ark. 598 [243 S.W. 851, 852-853 [6]], the same court ruled on the issue now before us. In *Outler* the trial court instructed on *both degrees of murder* but refused to instruct on manslaughter. The defendant, found guilty of first degree murder, contended that such refusal constituted prejudicial error. Rejecting this contention, the court declared: ''Conceding that there was evidence warranting the submission of the issue as to that degree of homi-

cide [manslaughter], we are of the opinion that there was no prejudice in the ruling of the court, for the reason that the jury, upon instructions correctly submitting the degrees of murder, found appellant guilty of murder in the first degree, which implies a finding that the killing was done with malice and after deliberation.'' Referring to an instruction given on first degree murder and reasonable doubt, the court further observed: ''*the verdict of the jury under this instruction necessarily implied a finding* that the killing was not done under circumstances which would reduce the degree of the offense to manslaughter, and no prejudice resulted from the failure of the court to instruct on the subject of manslaughter.'' (Italics added.)

Among the other jurisdictions that have held in accord with the above discussed general rule are Colorado,[13] Kansas,[14] Kentucky,[15] Nebraska,[16] Nevada,[17] North Carolina,[18] Texas,[19] and Wyoming.[20] No decision has been found in our sister states refusing to apply this rule when warranted by the facts.

Neither the *Carmen* majority opinion nor the present majority opinion answers or in any way refutes the reasoning from which this general rule is derived; *Carmen* did not discuss this phase of the matter at all, and the present majority do no more than bluntly assert (*ante*, p. 731) that ''There is no basis for distinguishing'' *Carmen* in this respect. Such assertion, it has been demonstrated, is unwarranted on the face of the *Carmen* opinion. The majority's reluctance to discuss the rule is not surprising, for it is particularly applicable to the facts of the case at bench.

To begin with, as the majority acknowledge (*ante*, p. 727), ''It was not disputed at the trial that defendant killed the two girls. The prosecution sought to prove that the killings were murders in the first degree on the ground that they

---

[13]*McKenna* v. *People* (1951) 124 Colo. 112 [235 P.2d 351, 355 [5-8]].

[14]*State* v. *Spencer* (1960) 186 Kan. 298 [349 P.2d 920, 924 [5]]; cf. *State* v. *Robinson* (1958) 182 Kan. 505 [322 P.2d 767, 771-772 [5, 6]].

[15]*Tarrence* v. *Commonwealth* (1953, Ky. App.) 265 S.W.2d 40, 51-52 [43, 44].

[16]*Braunie* v. *State* (1920) 105 Neb. 355 [180 N.W. 567, 569 [3-5], 12 A.L.R. 658].

[17]*State* v. *Loveless* (1944) 62 Nev. 312 [150 P.2d 1015, 1022 [11, 12]].

[18]*State* v. *Munn* (1904) 134 N.C. 680 [47 S.E. 15, 16].

[19]*Manning* v. *State* (1906) 51 Tex. Crim. 211, 215-216 [98 S.W. 251, 253-254].

[20]*State* v. *Lantzer* (1940) 55 Wyo. 230 [99 P.2d 73, 79 [9]].

were either wilful, deliberate, and premeditated, or occurred during the commission of burglary, rape, or an act punishable under Penal Code section 288. (Pen. Code, § 189.) *There is no question of the sufficiency of the evidence to support the verdicts."* (Italics added.)

The jury were given the customary instructions on presumption of innocence, burden of proof, and their duty to acquit the defendant unless convinced of his guilt beyond a reasonable doubt. In that connection they were instructed further that if the evidence was suceptible of equally reasonable inferences as to defendant's guilt or innocence, it was their duty to adopt that inference which would admit of defendant's innocence and reject that which pointed to his guilt. The jury were then *fully instructed on first and second degree murder,* on deliberation and premeditation, on malice, on intent, on the effect of voluntary intoxication, on the elements of the other felonies in the People's theory of the evidence, and on related matters. No complaint is now made as to the accuracy or propriety of any of these instructions. This is indeed in contrast to *Carmen,* where the majority (including Mr. Chief Justice Gibson and Mr. Justice Traynor, as well as the author of this dissent) held that "The [murder] instruction as given leaves no ground for the classification of murder of the second degree."

The jury, of course, are presumed to follow the instructions given by the court. *(People* v. *Rosoto* (1962), *supra,* 58 Cal.2d 304, 326 [5].) On each count in the case at bench the jury found defendant guilty of *murder in the first degree.* Yet the jury was specifically instructed that "Murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine whether the murder was of the first or second degree.

"When upon the trial of a charge of murder, the jury is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, *but has a reasonable doubt whether such murder was of the first or of the second degree, the jury must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree."* (Italics added.) It follows that the jury, obedient to the instructions of the court, could not have reached their verdicts unless they had found beyond a reasonable doubt that defendant was guilty of first degree rather than second degree murder. To so find, of course, the jury

(under the full and correct instructions given here) must necessarily have considered and rejected the evidence of second degree murder; i.e., the evidence (according to defendant's witnesses) that defendant entered the Mack house in a state of intoxication without felonious intent for the purpose only of "frightening" Connie, and that in striking the blows that resulted in the girls' deaths he did so without conscious intent either to strike or to injure them. But *that* evidence is identical with the testimony recited at length by the majority as constituting evidence from which "the jury could have found defendant guilty of involuntary manslaughter." (*Ante*, p. 730.) Therefore, for myself, unless I disavow my oath or my reason, I must conclude that the jury *did* determine—on the only relevant evidence—the issue of whether defendant lacked the necessary intent to commit murder in the first degree and hence was guilty at most of a lesser crime, whether second degree murder or manslaughter. The jury in the case at bench, it is admitted, were adequately instructed on that issue, and resolved it unfavorably to defendant. The jury therefore determined "every material issue presented by the evidence," and the failure to instruct on manslaughter in particular must be deemed not to have caused a miscarriage of justice. (Cal. Const., art. VI, § 4½).

This is not idle speculation, but rather a respect for reality and justice in the administration of criminal law. The majority's argument that "we do not know what effect an instruction that the jury could return a verdict of manslaughter would have made on its deliberations" (*ante*, p. 731) appears to me to suggest either a confession of weakness in their position or an abdication of duty. Section 4½ of article VI mandatorily imposes a duty on this court: the duty, when it finds error, to definitely conclude "after an examination of the entire cause, including the evidence, . . . [that it is, or is not] of the opinion that the error complained of has resulted in a miscarriage of justice." (See *People* v. *Watson* (1956) 46 Cal.2d 818, 835-837 [12-13] [299 P.2d 243].) In the circumstances the majority's disavowal of any relevant opinion is at best speculative, because they thereby refuse, in the face of article VI, section 4½, to draw the obvious and —if words are to have any meaning—only reasonable conclusion from the evidence in the case, the instructions given, and the jury's verdicts. In the circumstances here shown, as in *McKenna* v. *People* (1951), *supra*, 124 Colo. 112 [235 P.2d 351, 355 [5-8]], "There is no logical reason to assume

that a jury which might have returned a verdict of second degree murder, but instead returned one of murder of the first degree, would have for one moment entertained returning a verdict of manslaughter.'' To concur in the majority's speculation on this issue would for me, in the light of such capacity as I have been given for applying reason, common sense, and human experience, constitute a violation of my duty under article VI, section 4½, of the California Constitution, and a travesty of justice.

For all the reasons stated I would affirm the judgments.

McComb, J., concurred.

Respondent's petition for a rehearing was denied July 3, 1963. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.